557 S.E.2d 235

LAWYER DISCIPLINARY
BOARD, Complainant,

v.

Marc P. TURGEON, a Member
of the West Virginia State
Bar, Respondent.

No. 25189.

Supreme Court of Appeals of
West Virginia.

Submitted Nov. 28, 2000.

Decided Dec. 8, 2000.

Amie L. Johnson, Office of Disciplinary Counsel, Charleston, for complainant.

Marc P. Turgeon, Charleston, respondent pro se.

PER CURIAM:

This is a lawyer disciplinary matter instituted by the petitioner, the Lawyer Disciplinary Board ("the Board"), against the respondent, attorney Marc P. Turgeon, pursuant to the *West Virginia Rules of Lawyer Disciplinary Procedure*. The Board alleged that the respondent repeatedly engaged in conduct that violated the *West Virginia Rules of Professional Conduct* in the course of representing three different clients.

A Hearing Panel Subcommittee of the Lawyer Disciplinary Board conducted extensive hearings on the allegations against the respondent, and now recommends to this Court a number of sanctions against the respondent, including a recommendation that the respondent's license to practice law be suspended for a period of 2 years.

After a thorough review of the record and arguments of counsel, we agree with the findings and recommendations of the Board.

## I.

 Rule 3.7 of the *Rules of Lawyer Disciplinary Procedure* states the standard of proof in a lawyer disciplinary matter quite clearly: "In order to recommend the imposition of discipline of any lawyer, the allegations of the formal charge must be proved by clear and convincing evidence." *See* Syllabus Point 1, *Lawyer Disciplinary Bd. v. McGraw*, 194 W.Va. 788, 461 S.E.2d 850 (1995). Our standard for reviewing recommendations of the Board regarding sanctioning a lawyer for ethical violations was set forth in Syllabus Point 3 of *Committee on Legal Ethics v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994):

> A *de novo* standard applies to a review of the adjudicatory record made before the [Hearing Panel Subcommittee of the Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Hearing Panel Subcommittee's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Hearing Panel Subcommittee's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

We have also clearly expressed our role in attorney disciplinary proceedings:

> This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law.

Syllabus Point 3, *Committee on Legal Ethics of the West Virginia State Bar v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984).

 In devising suitable sanctions for attorney misconduct, we have recognized that "[a]ttorney disciplinary proceedings are not designed solely to punish the attorney, but rather to protect the public, to reassure it as to the reliability and integrity of attorneys and to safeguard its interest in the administration of justice." *Lawyer Disciplinary Bd. v. Taylor*, 192 W.Va. 139, 144, 451 S.E.2d 440, 445 (1994). We also asserted in Syllabus Point 2 of *In re Daniel*, 153 W.Va. 839, 173 S.E.2d 153 (1970), that "[d]isbarment of an attorney to practice law is not used solely to punish the attorney but is for the protection of the public and the profession." In addition to protecting the public and the profession, the discipline of an attorney also must serve as both instruction on the standards for ethical conduct and as a deterrence against similar misconduct to other attorneys. As we stated in Syllabus Point 3 of *Committee on Legal Ethics v. Walker*, 178 W.Va. 150, 358 S.E.2d 234 (1987):

> In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession.

With these standards in mind, we examine the charges against the respondent.

## II.

The Board alleged that the respondent engaged in misconduct during the representation of 3 separate clients: Douglas Gunnoe, Ronald Wooding, and James Ballard. During the course of 4 separate days of testimony, the Board took evidence regarding these 3 representations. The Board then issued 36 pages of findings, legal conclusions, and recommended sanctions regarding the respondent.

## A.

### The Douglas Gunnoe Case

In 1991, Douglas Gunnoe was serving a 5–to–18 year imprisonment sentence for second-degree murder, for stabbing to death a counselor whom he met in a substance abuse program. While on work release for the second-degree murder, Mr. Gunnoe met Alicia McCormick, a woman who performed domestic violence counselor duties at the work release center. Mr. Gunnoe was employed doing maintenance at the apartment complex in which Ms. McCormick resided. Ms. McCormick was stabbed to death with a knife in her apartment on or about July 20, 1991. Mr. Gunnoe was charged with the offense, and he admitted to the police certain details of the crime.[1]

The respondent was appointed to represent Mr. Gunnoe.

#### i.

#### Competence

■ In the course of representing Mr. Gunnoe, the Board asserted that the respondent violated Rule 1.1 of the *Rules of Professional Conduct,* which states:

> A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

The respondent had very little experience defending criminal cases, particularly serious cases such as the Gunnoe matter. Consequently, the circuit court appointed additional, more experienced lawyers to assist the respondent, but the other lawyers were unable to participate in Mr. Gunnoe's defense because the respondent would not adjust his schedule so that the other lawyers might help. The respondent told one of these lawyers that he should not be participating in

Mr. Gunnoe's defense, because the lawyer believed Mr. Gunnoe was guilty.

Through the course of two trials,[2] the respondent engaged in long and repetitious cross-examinations that did not extract information helpful to the defense. The circuit judge stopped the first trial three times, took Mr. Gunnoe and the respondent into his chambers, and advised Mr. Gunnoe of the judge's concerns that the Respondent was not representing him competently. When the first trial ended in a mistrial, the circuit judge removed the respondent as counsel because of his incompetence. Mr. Gunnoe and the respondent then consulted together at the counsel table, and the respondent apparently announced he would continue as Mr. Gunnoe's counsel, although not as court-appointed counsel.[3]

During the course of Mr. Gunnoe's trials, the respondent apparently proffered odd defense theories to the prosecutor. At one point, the respondent suggested that the prosecutor look at the case as a suicide—even though Ms. McCormick suffered a stab wound which penetrated her back and almost exited out her front, and there were five stab wounds in her chest. The respondent also suggested that the prosecutor take the police report, remove any references to Mr. Gunnoe, and submit it to the FBI profiling unit so that they could determine the "real murderer"—even though Mr. Gunnoe had confessed to portions of the crime.

On the basis of evidence such as this, the Board concluded that the respondent had violated Rule 1.1, and had failed to provide Mr. Gunnoe with competent representation.

#### ii.

#### Candor towards a Tribunal

■ The Board also alleged that the respondent violated Rule 3.3 in the Gunnoe case. Rule 3.3 states, in part:

(a) A lawyer shall not knowingly:

---

1. For additional facts, *see McCormick v. West Virginia Dept. of Public Safety,* 202 W.Va. 189, 503 S.E.2d 502 (1998); *State v. Gunnoe,* 179 W.Va. 808, 374 S.E.2d 716 (1988).

2. The first trial of Mr. Gunnoe was declared a mistrial when the circuit court learned that one juror knew of Mr. Gunnoe's prior murder convic-

tion, and revealed that conviction to another juror.

3. The circuit judge later removed the respondent from the county's criminal appointment list, contending that other criminal defendants would not receive effective assistance of counsel from the respondent.

(1) make a false statement of material fact or law to a tribunal;

(2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client; ...

(4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures.

. . .

(c) A lawyer may refuse to offer evidence that the lawyer reasonably believes is false.

During the preparations for Mr. Gunnoe's first trial, the respondent alleged various defense theories to the prosecutor and to other defense attorneys. He alleged that the victim's former fiance had committed the crime—even though he was on an airplane at the time. He alleged that a neighbor had committed the crime—even though the neighbor was away for a 2–week tour in the National Guard at the time.

At trial, the respondent proffered the defense that Mr. Gunnoe's wife had murdered Ms. McCormick. In a sworn statement to the Office of Disciplinary Counsel, the respondent admitted that *he* had first voiced to Mr. Gunnoe that Mrs. Gunnoe was the killer, and admitted that Mr. Gunnoe was not the first to raise this theory. The respondent recounted multiple discussions where Mr. Gunnoe kept giving false explanations for what happened. After hearing these alternate explanations, the respondent proposed that Mrs. Gunnoe was the true killer, and Mr. Gunnoe apparently agreed.

At both trials, the respondent questioned Mr. Gunnoe and elicited testimony that Mrs. Gunnoe had committed the crime.

After testimony began in the first trial, the respondent notified the police that he and/or the respondent's wife had discovered a pair of women's underwear near the apartment complex where the murder had occurred some 3 years earlier. The respondent asserted that the underwear belonged to Mrs. Gunnoe, and that it was stained with blood wiped from her body after killing Ms.

McCormick. At one point the respondent asserted he found the underwear, but later asserted his wife found it, even though such information was critical to establishing a chain of custody for the evidence. Furthermore, the day on which the underwear was found varied in the respondent's statements. A later laboratory examination of the underwear found no blood.

During the course of Mr. Gunnoe's cross-examination by the prosecutor, Mr. Gunnoe made a reference to a polygraph examination. The circuit judge then gave the jury a cautionary instruction that "under the law of the State of West Virginia, polygraph evidence is not admissible and should not be referred to by any parties in this case."

Immediately following the circuit judge's cautionary instruction, the respondent stated before the jury "Can it be admitted by stipulation, Your Honor? Michelle [Gunnoe] and Doug [Gunnoe] both took the lie detector test." Neither Mr. nor Mrs. Gunnoe had ever taken a polygraph test.

The Board concluded from this evidence that the respondent had violated Rule 3.3, and had proffered false evidence before the circuit court.

iii.

### Impartiality and Decorum before a Tribunal

■ In front of the jury, the respondent referred to the prosecuting attorney as a "coke dealer." The prosecutor denied that he had ever has been a "coke dealer." Furthermore, such evidence was not relevant in any way to the Gunnoe trial.

The Board concluded that statements such as this violated Rule 3.5, which states, in part:

A lawyer shall not: ...

(c) engage in conduct intended to disrupt a tribunal.

The Board found this conduct, as well as the respondent's conduct in mentioning the nonexistent polygraph test, were intended to be disruptive to a jury and were prejudicial to the administration of justice.

## B.

### The Ronald Wooding Case

In June 1995, Ronald Wooding was indicted in the United States District Court for the Southern District of West Virginia for distribution, possession with the intent to distribute, and conspiracy to distribute crack cocaine. Mr. Wooding was also indicted on a weapons charge. A co-defendant, Terrence Carter, was also indicted.

The respondent was appointed to represent Mr. Wooding.

### i.

### Competence and Diligence

■ In the course of representing Mr. Wooding, the Board alleged that the respondent had violated Rule 1.1, which as previously stated requires a lawyer to "provide competent representation to a client." The Board also alleged that the respondent violated Rule 1.3, which states that "A lawyer shall act with reasonable diligence and promptness in representing a client."

After Mr. Wooding was indicted, a federal prosecutor offered a plea bargain to the respondent. A portion of the plea bargain involved Mr. Wooding "wearing a wire" to assist the government in a criminal investigation of illegal cocaine distribution. Alternatively, Mr. Wooding could have aided the government by submitting to a "debriefing" by federal law enforcement officers, that is, submit to their questioning. By accepting the plea offer and cooperating, Mr. Wooding would have faced a lower sentence under the federal sentencing guidelines.

The respondent stated to the federal prosecutor that he refused to negotiate a plea agreement for Mr. Wooding, and denied that Mr. Wooding had any involvement in the distribution of drugs. The respondent insisted that the indictment be dismissed, and stated that Mr. Wooding would plead guilty to nothing more than simple possession based upon an information. The respondent also stated that co-defendant Carter would exculpate Wooding. Furthermore, although the law regarding possessing a weapon was clearly established, the respondent repeatedly told the federal prosecutor that he could

convince one member of the jury that the law was incorrect, and that Mr. Wooding should be acquitted.

Approximately 2 months after the indictment, the federal prosecutor met with the respondent and, apparently for the first time, with Mr. Wooding. During their meeting, the federal prosecutor perceived that the respondent had failed to advise Mr. Wooding of her previous offer of a plea bargain. She also learned that Mr. Wooding—and apparently, the respondent—did not understand how the federal sentencing guidelines operated, and did not understand the extensive sentence Mr. Wooding faced if he did not plead guilty and cooperate.

The respondent told the federal prosecutor that she was jaded and cynical and had been at her job too long, and was "assuming things that weren't there." The respondent again insisted that Mr. Wooding had no legal culpability. When the federal prosecutor attempted to explain her understanding of the case, the respondent suggested she was being misleading or was misrepresenting the evidence.

Mr. Wooding's co-defendant, Carter, subsequently was the first to accept the government's plea offers; he then gave a statement to the FBI which was incriminating to Mr. Wooding. When the federal prosecutor advised the respondent that Mr. Carter had accepted a plea offer, the respondent accused her of lying. The federal prosecutor then personally gave the respondent a copy of a summary of Mr. Carter's debriefing. In an open courtroom, in a statement overheard by court personnel, the respondent stated, "Oh, I know what this is. This is the script you've given Carter so that he could perjure himself," or words to that effect.

Prior to Mr. Wooding's trial, the respondent filed numerous pretrial motions late. When the district court extended the deadline for filing additional motions, the respondent again did not file his motions on time. The respondent waited until the day before trial was to begin to file a motion seeking court-appointed expert and investigative services. The trial was continued to a new date, and the respondent waited until 4 days before the new trial to file a motion to exceed

the $300.00 limit for expert services. The respondent did not even have the name of the expert which he proposed to call.

The respondent's representation of Mr. Wooding was ineffective in other areas. The respondent failed to appear at a hearing before the district court, requiring the district judge's staff to locate the respondent and demand his presence. The respondent did not issue subpoenas until the Friday before the trial, scheduled to begin on Tuesday. The respondent requested subpoenas of the same witnesses which the government had previously subpoenaed. The federal prosecutor had interviewed these witnesses, at least one of whom was a police officer, and all of whom had provided incriminating evidence against Mr. Wooding.

The day before trial, the federal prosecutor voiced her concerns to the district court over whether Mr. Wooding was being adequately represented. The district court agreed with her concerns, and appointed another attorney to assist in the representation of Mr. Wooding. The district court directed the parties to appear at the scheduled time of trial the next day. Court personnel, the new attorney, the federal prosecutor and jury appeared. The respondent was an hour late.

Based upon the aforementioned evidence, the Board concluded that the respondent violated Rules 1.1 and 1.3, and failed to provide Mr. Wooding with competent and diligent representation.

### ii.

### *Communication with a Client*

█ The Board alleges that the respondent violated Rule 1.2(a), that states in part:

(a) A lawyer shall abide by a client's decisions concerning the objectives of representation ... and shall consult with the client as to the means by which they are to be pursued. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

Additionally, the Board contends that the respondent violated Rule 1.4, that states:

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

The Board concluded that the respondent never conveyed the plea offers from the federal prosecutor, and the effect of accepting those offers under the federal sentencing guidelines, to Mr. Wooding.

When a new attorney from the Federal Public Defender's Office was appointed to assist the respondent in his representation of Mr. Wooding, the attorney reviewed the indictment, and immediately told Mr. Wooding of the minimum and maximum penalties he was exposed to on each count. He further explained the sentencing guidelines. In the attorney's perception, Mr. Wooding did not understand Wooding's exposure under the sentencing guidelines until it was explained to him on the day scheduled for trial.

The respondent indicated to the new attorney—incorrectly—that the government's plea offer was to all counts in the indictment, "straight up," and apparently this is what he communicated to Mr. Wooding. The respondent did not explain to Mr. Wooding that he would get a sentence reduction for his lesser role in the conspiracy if he cooperated with the government, and did not explain his exposure under the sentencing guidelines. Mr. Wooding testified that the respondent never advised him of the maximum penalty he was facing under the indictment, and did not convey to the respondent the benefits of cooperating with the government.

Mr. Wooding also indicated that the respondent never advised him of the penalty for the weapons charge, or what the government had to prove with respect to the charge. Apparently, the respondent merely told Mr. Wooding that he would "get him off" the weapons charge.[4]

4. The parties agree that subsequent to the con- clusion of Mr. Wooding's case, the United States

The Board concluded that the respondent's actions inhibited his client's ability to make an informed decision on whether or not to plead and cooperate with the government. The Board held that the decision whether or not to accept a plea rests with the client, not the lawyer, but that decision was impaired by the respondent's conduct. The Board therefore concluded that the respondent had violated Rules 1.2 and 1.4.

## C.

### The James Ballard Case

In July 1988, James Ballard shot Rodney Edwards in the face. A witness apparently saw the gun in Mr. Ballard's hand, and saw him discharge the gun at point-blank range into Mr. Edward's face. Mr. Edwards lived, and Mr. .Ballard was later convicted of malicious wounding.

Two weeks after the shooting, Mr. Edwards brought a civil lawsuit against Mr. Ballard, seeking monetary damages. Throughout 1988 and 1989, attorneys for the parties conducted discovery, including taking the deposition of the sole witness to the shooting, James Harless. Mr. Ballard discharged his attorney sometime in 1991.

Sometime in 1994 or 1995, the respondent was hired to represent Mr. Ballard in an unsuccessful petition for a writ of habeas corpus. On April 28, 1995, the respondent entered an appearance on behalf of Mr. Ballard in the civil suit.

### i.

### False Statements regarding a Judge

■ The Board asserts that the respondent violated Rule 8.2(a), which states:

A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer, or of a candidate for election or appointment to judicial or legal office.

In November 1995, the respondent began to take additional discovery in the civil lawsuit against Mr. Ballard. The respondent sought to take another deposition of Mr. Harless, but Mr. Harless refused to participate. The respondent took the deposition of the lead detective from the criminal investigation, as well as depositions from four other police officers. The respondent's questions sought to elicit testimony by the officers of impropriety in the investigation, but none of the officers admitted to any impropriety.

On December 22, 1995, counsel for the Edwards' filed a motion for summary judgment.

On January 2, 1996, the respondent replied by filing a "Motion for Extension of Time to Answer Motion for Partial Summary Judgment." In the motion, the respondent alleged that Mr. Ballard had "been denied any opportunity to have discovery in this case to date, and therefore is prejudiced by a decision on summary judgment at this time." The respondent also claimed that "newly discovered evidence has become available in the form of proof of perjury of James C. Harless in the [criminal] trial . . . ." The respondent did not explain in the motion that much discovery had been accomplished during 1988 and 1989, and that the respondent himself had taken five depositions. The "newly discovered evidence" was also not specified, and the respondent could not identify this evidence even before the Hearing Panel Subcommittee.

Also on January 2, 1996, the respondent filed a "Motion to Recuse" the circuit judge, who presided over both the criminal and civil portions of the Ballard case. In the recusal motion, the respondent asserted that the circuit judge had acted with partiality against

Supreme Court issued an opinion that would have been favorable to Mr. Wooding on the weapons charge, and essentially adopted the legal position proffered by the respondent. The respondent therefore contends he did nothing wrong in asserting this argument in Mr. Wooding's case.

The respondent misses the point of the *Rules of Professional Conduct.* The law at the time was firmly established and was not favorable to Mr. Wooding on this issue. It should have been Mr. Wooding's decision whether to try and get the law changed on appeal, not the respondent's decision alone. The respondent risked additional incarceration for Mr. Wooding without explaining the various options available, in violation of the *Rules.*

Mr. Ballard, and had "cooperated with the prosecution to convict Mr. Ballard on false, misleading and perjured testimony and evidence." The motion also accused the judge of assisting the prosecutor in manufacturing false evidence, and violating Mr. Ballard's constitutional rights.

The respondent also wrote letters to the United States Attorney alleging improprieties by numerous individuals involved with the Ballard case. He alleged that Mr. Edwards and the police were involved in "cocaine distribution," and that official records had been altered to protect the career of the attorney representing the Edwards.

It appears that the respondent never communicated with the prosecutor or Mr. Ballard's criminal trial counsel regarding Mr. Ballard's trial. The respondent also never examined the transcript of the criminal trial. The respondent now claims that he based his accusations on statements by his client, Mr. Ballard. In essence, the respondent did not believe the circuit judge did such things as manufacture evidence—his client believed it, and the recusal motion was merely made on the basis of this belief.

The Board found that the respondent's accusations were false, and were made with a reckless disregard for the truth or falsity of the matters alleged. The respondent's allegations were also made without a reasonable inquiry into the matters.

The Board concluded that Rule 17 of the *Trial Court Rules*[5] and Rule 11 of the *Rules of Civil Procedure*[6] place an affirmative duty upon lawyers to make a reasonable inquiry into the facts before filing a motion to recuse

a judge. If nothing else, the Board indicated that the extreme nature of the allegations the respondent was making should have alerted him to the need to investigate and not merely rely upon the word of his client.

By making statements about a judge with reckless disregard for their truth or falsity, the Board concluded that the respondent had violated Rule 8.2(a).

### ii.

### *A Lawyer must respond to Demands for Information regarding Disciplinary Matters*

■ By letter dated March 7, 1996, the Office of Disciplinary Counsel asked the respondent to provide information in support of his motion to recuse the circuit judge. This request for information was sent in response to an ethics complaint. The respondent did not respond to the letter.

A second letter, dated June 7, 1997, again asked the respondent to provide information to support his statements. Again, the respondent did not reply.

The Board asserts that the respondent's failure to reply to requests for information regarding an ethics complaint violated Rule 8.1(b), that states, in part:

... [A] lawyer ... in connection with a disciplinary matter, shall not: ...

(b) ... knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this rule does not require disclosure of information otherwise protected by Rule 1.6.

---

5. The version of Rule 17 of the *West Virginia Trial Court Rules* in effect at the relevant times provided that a motion to disqualify a judge: ... shall be accompanied by a verified certificate of counsel of record ... that he or she has read the motion; that to the best of his or her knowledge, information, and belief formed after reasonable inquiry that it is well grounded in fact and is warranted by existing law or good faith argument for the extension, modification, or reversal of existing law; that there is evidence sufficient to support disqualification; and that it is not interposed for any improper purposes, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

6. Rule of the *West Virginia Rules of Civil Procedure* provided that:

The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purposes, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

## III.

We have carefully examined the extensive findings and conclusions of the Hearing Panel Subcommittee of the Lawyer Disciplinary Board. We have also considered the respondent's answer to the findings and conclusions contained in his rambling, 80–page brief filed with this Court,[7] and we listened to respondent's oral argument in this matter.

We find substantial evidence in the record to support the Hearing Panel Subcommittee of the Lawyer Disciplinary Board's findings of fact, and believe that the Office of Disciplinary Counsel proved the allegations contained in the various charges by clear and convincing evidence. The Board properly found that the respondent violated Rule 1.1 (regarding competence); Rule 3.3 (regarding candor towards a tribunal); Rule 3.5 (regarding disruptive conduct); Rule 1.3 (regarding diligence); Rule 1.2 (regarding abiding by a client's decisions); Rule 1.4 (regarding communicating with a client); Rule 8.2 (regarding making statements about a judge with a reckless disregard for the truth); and Rule 8.1 (regarding a requirement to respond to requests for information from the Office of Disciplinary Counsel).

The Board found the respondent "ill-prepared" for the disciplinary proceedings, and found that he "spent a great deal of time riffling through boxes of papers looking for possible exhibits." Many of these exhibits were not helpful to his case, and the Board found the exhibits "harmed his case and credibility." The Board believed that while the respondent spent many hours in preparation for his case and the disciplinary hearings, "he has exhibited a lack of good judgment or knowledge as to how to handle these legal matters." In sum, the Board concluded—in both his representation of himself and others—that the respondent "has exhibited a pattern of not competent, ill-prepared legal work[.]" We agree with the Board's assessment.

■ The Board recommends that the respondent be suspended from the practice of law for 2 years for his misconduct. The Board also recommends that, as a condition for reinstatement, the respondent must complete 12 hours of continuing legal education relating to ethics. Additionally, the Board suggests that before the respondent be allowed to be reinstated, he demonstrate by medical and psychological testimony that he is presently capable of practicing law.[8] As a condition of reinstatement, the Board recommends that the respondent be required to have in place a plan of supervised practice for a period of 2 years. Lastly, the Board recommends that the respondent be required to pay the costs of these proceedings.

■ "[T]his Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syllabus Point 3, *Committee on Legal Ethics of the West Virginia State Bar v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984). We accept and adopt the Board's recommended sanctions against the respondent.

It is therefore Ordered that:

1. The respondent, Marc P. Turgeon, is suspended from the practice of law for a period of 2 years. He must petition for reinstatement pursuant to Rule 3.32 of the *Rules of Lawyer Disciplinary Procedure*.

2. As a mandatory condition for reinstatement, the respondent must complete 12

---

7. Our *Rules of Appellate Procedure* plainly state that a brief filed with this Court "shall not exceed fifty pages, inclusive of any addendum." *See* Rules 3(c) and 10(d).

The Clerk of the Court refused to accept the respondent's brief, "lodging" the brief in the Court's files, and wrote a letter indicating that the respondent must either submit a new brief within the 50–page limit, or petition the Court for leave to exceed the limit. The respondent never responded.

Because of the harshness of the recommended sanction, we have examined the respondent's brief. However, we note that the respondent's failure to respond to the Clerk's requests, as well as the respondent's deliberate disregard for this Court's rules, does little to mitigate the circumstances supporting the Board's recommendations.

8. We have previously approved of such a requirement. *See, e.g., Committee on Legal Ethics v. Farber*, 185 W.Va. 522, 408 S.E.2d 274 (1991).

hours of continuing legal education relating to ethics.

3. As a mandatory condition for reinstatement, the respondent must have in place a plan of supervised practice to last for a period of 2 years from the date of reinstatement. The supervision plan must have the respondent working very closely with a mentoring/supervising lawyer. The plan must be comprehensive, and must involve the supervising lawyer in every case the respondent is handling. It will not be sufficient for the respondent and supervising lawyer to meet on an occasional basis to have general discussions about the respondent's practice. The supervising lawyer must be familiar with the substantive law areas in which the respondent practices. The responsibility of locating a supervising attorney and drafting a supervision plan shall rest with the respondent, although the Office of Disciplinary Counsel must, within reason, approve of the supervising attorney selected and the contents of the plan. If the respondent and the Office of Disciplinary Counsel cannot agree upon a supervising attorney or the contents of the plan, the matter may be submitted to a Hearing Panel Subcommittee of the Lawyer Disciplinary Board. The supervising attorney must make regular reports to the Office of Disciplinary Counsel.

4. As a mandatory condition for reinstatement, the respondent must demonstrate by expert medical and psychological testimony that he is presently capable of practicing law.

5. The respondent must pay all costs of this proceeding. *See* Rule 3.15 of the *Rules of Lawyer Disciplinary Procedure.*

Suspension of License with Conditions.

Justice McGRAW dissents.

Justice SCOTT, deeming himself disqualified, did not participate in this decision of this case.