671 S.E.2d 658

**LAWYER DISCIPLINARY BOARD, Complainant**

v.

**Mark A. BLEVINS, a member of The West Virginia State Bar, Respondent.**

No. 33281.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 23, 2008.

Decided Sept. 26, 2008.

Rachael L. Fletcher Cipoletti, Esq., Chief Lawyer Disciplinary Counsel, Office of Disciplinary Counsel, Charleston, for the Complainant.

Richard W. Hollandsworth, Esq., Wheeling, for the Respondent.

PER CURIAM:[1]

This lawyer disciplinary proceeding concerning the respondent, Mark A. Blevins, is

---

1. Pursuant to an administrative order entered on September 11, 2008, the Honorable Thomas E. McHugh, Senior Status Justice, was assigned to sit as a member of the Supreme Court of Appeals

before this Court upon the Report of the Hearing Panel Subcommittee of the West Virginia Lawyer Disciplinary Board and the Subcommittee's recommended sanctions: (1) that respondent Blevins' license to practice law in the State of West Virginia be suspended for a period of eighteen months; (2) that, upon reinstatement, his private practice be supervised for a period of two years; (3) that respondent Blevins complete nine hours of Continuing Legal Education in ethics in addition to such ethics hours he is otherwise required to complete to maintain his active license to practice, said additional nine hours to be completed in the current reporting period after he is reinstated; and (4) that respondent Blevins pay the costs of these proceedings.

Respondent Blevins was admitted to The West Virginia State Bar in 1993 and maintains a private law practice in Wheeling, West Virginia. The findings and recommended sanctions of the Hearing Panel Subcommittee arose from a Statement of Charges filed in this Court by the Investigative Panel of the Lawyer Disciplinary Board. Following an evidentiary hearing conducted in October 2007, the Hearing Panel Subcommittee found that the allegations were proven and that respondent Blevins' actions constituted transgressions of the West Virginia Rules of Professional Conduct. The Subcommittee's Report containing its findings and the recommended sanctions was filed in this Court on March 24, 2008. Although the respondent filed an objection to the Report, he did not file a brief.

This Court has before it the findings and recommendations contained in the Report of the Hearing Panel Subcommittee, all matters of record including the audio and video tapes admitted at the evidentiary hearing and the brief filed by the Office of Disciplinary Counsel. Upon review by this Court *de novo*, and for the reasons expressed below, this Court concludes that the magnitude of respondent Blevins' actions, which included, at a minimum, recklessly encouraging a convicted felon to intimidate, by violence or the threat of violence, certain former clients who owed the

of West Virginia commencing September 12, 2008 and continuing until the Chief Justice deter-

respondent money, warrants the annulment of the respondent's license to practice in this State. Moreover, this Court concludes that it would be appropriate, as a prerequisite to reinstatement, for the respondent to be certified by a psychiatrist, to be selected jointly by the respondent and the Office of Disciplinary Counsel, that the respondent is in such condition that his ability to practice law will result in the protection of the public. *See, Lawyer Disciplinary Board v. McCorkle*, 219 W.Va. 245, 252, 633 S.E.2d 1, 8 (2006).

With that modification, this Court concludes that the Report and recommendations of the Hearing Panel Subcommittee are otherwise supported by the evidence. Accordingly, this Court orders: (1) that respondent Blevins' license to practice law in the State of West Virginia be annulled; (2) that, upon reinstatement, his private practice be supervised for a period of two years; (3) that respondent Blevins complete nine hours of Continuing Legal Education in ethics in addition to such ethics hours he is otherwise required to complete to maintain his active license to practice, said additional nine hours to be completed in the current reporting period after he is reinstated; and (4) that respondent Blevins pay the costs of these proceedings. In addition, as a prerequisite to reinstatement, respondent Blevins shall be certified by a psychiatrist, to be selected jointly by the respondent and the Office of Disciplinary Counsel, that the respondent is in such condition that his ability to practice law will result in the protection of the public.

## I.

### Factual Background

In December 2006, the Investigative Panel of the Lawyer Disciplinary Board, upon a finding of probable cause, filed a Statement of Charges against respondent Blevins alleging violations of Rule 8.4.(a), (b) and (d) of the Rules of Professional Conduct. Those sections provide:

It is professional misconduct for a lawyer to:

mines that assistance is no longer necessary, in light of the illness of Justice Joseph P. Albright.

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

\* \* \*

(d) engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]

The evidence presented below indicates that, in 2003, respondent Blevins paid Curtis Griffin $500 to locate an individual named Horbatak, a contractor hired to renovate the respondent's office building. According to the respondent, Horbatak failed to pay the subcontractors who worked on the building and was indebted to the respondent in the amount of $7,500 to $8,000.

After several weeks without hearing anything from Griffin, a series of telephone calls took place, in February 2004, between Griffin and William Curtin. Curtin was a part time process server and courier for the respondent. Curtin told Griffin that, if he could obtain a handgun for respondent Blevins, the $500 would be forgiven. In addition, Curtin indicated that there were four people the respondent wanted them to "go get" who owed the respondent money. Curtin stated that he, Griffin and the respondent would share the monies collected. One person "down in Uniontown" was to have his "brain beat in." Unknown to Curtin, his comments were recorded by law enforcement officers. At that time, Griffin was an informant in an unrelated matter for the Ohio Valley Drug Task Force and had advised the officers about some of his contacts with Curtin.[2]

On February 21, 2004, Griffin, with audio and video surveillance devices hidden on his body, met Curtin and respondent Blevins in an alley near Market Street in Wheeling. From there, they walked to a nearby 7–Eleven Food Store and then to respondent Blevins' law office. While in the office, the respondent confirmed that he wanted Griffin to obtain a handgun for him. Moreover, four people who owed the respondent money were discussed. First, the respondent stated that, of the amount owed by contractor Horbatak, the respondent wanted $5,000, and Griffin and Curtin could keep the excess. The respondent warned: "So you've got to let [Horbatak] know, if he opens his mouth to anyone, he's done." Second, respondent Blevins stated that the individual in Uniontown was a former client who owed him $3,400. The respondent stated that he wanted $400 from that individual and that Griffin and Curtin could split the $3,000. Again, the respondent warned: "But you tell him, if he goes and talks to anybody on the planet, he's going to have a little problem here." Griffin replied: "I'll cut his f\*ckin' tongue out."

Third, respondent Blevins stated that a former client by the name of Stiltenpole in West Alexander, Pennsylvania, owed him $1,500 and that, upon collection, Griffin and Curtin could share the entire amount. As the respondent concluded: "Well, he's probably the easiest because he's a dope dealer, and he may not go squealing." Fourth, the respondent stated that a former client by the name of Dickerson of Belmont County, Ohio, owed him $2,000. Respondent Blevins stated that, upon collection, he wanted $1,000, and Griffin and Curtin could share the remaining $1,000. As respondent Blevins stated: "This guy thinks he's a tough guy, but he'll crack like a cookie, and he has got money."

During the February 21, 2004, meeting, Griffin stated three times that he was a "two-

---

2. With regard to the Uniontown individual, the transcript of the telephone conversation states in part:

Mr. Curtin: " \* \* \* All he wants is evidence that the guy got his fuckin' brain beat in."
Mr. Griffin: "Evidence that he got his ..."
Mr. Curtin: "You know what that means, don't you?"
Mr. Griffin: "Yeah."
Mr. Curtin: "That means we walk back in and tell Blevins, 'Yeah, it's done.'"

In his telephone conversations with Curtin and in meetings with Curtin and respondent Blevins, Griffin, with two prior felony convictions, consistently communicated his willingness to engage in violence, or the threat of violence, with regard to the people who owed the respondent money. Although the nature of the prior felony convictions remains unclear, the record in this matter shows that, in September 2005, Griffin was additionally convicted of malicious assault and kidnapping.

time loser." Respondent Blevins subsequently testified before the Hearing Panel Subcommittee that, although he did not believe Griffith was being truthful in making that statement, he understood the phrase "two-time loser" to mean a person with prior criminal convictions. In any event, after the comments were made by Griffin, the respondent stated:

> Mr. Blevins: "But what I'm saying is Billy [Curtin] will know exactly when I'm leaving. He knows exactly when I'm coming back. I don't care. First, I don't care what you do."
>
> Mr. Griffin: "Okay. Just get the money."
>
> Mr. Blevins: "But whatever you do, I'm somewhere else."
>
> Mr. Griffin: "Right."

Finally, during the February 21, 2004, meeting, a number of other individuals who owed the respondent money were discussed, and the respondent indicated that, when Griffin and Curtin collected the money from the first four, set forth above, the respondent would give Griffin and Curtin "another list."

On February 24 and February 25, 2004, discussions took place between Griffin and Curtin in Wheeling: (1) at The Sportsman Club, (2) an establishment known as Little Ricky's and (3) in Curtin's vehicle, all of which were the subject of audio and video surveillance by the Ohio Valley Drug Task Force. Griffin and Curtin talked about obtaining the handgun for the respondent and about the plan to recover the various monies from the individuals discussed on February 21, 2004. In carrying out the plan, Griffin suggested that he and Curtin bring ski masks, tape and gloves.[3]

---

3. On November 4, 2004, William Curtin gave a written statement to the Task Force in which he admitted having discussions with Griffin about "getting the money from these different people." Curtin, however, stated that it was just "tough talk" and that he never subsequently met with Griffin to do the things they planned.

Curtin also stated that the handgun respondent Blevins wanted was to be a "throwaway."
That term became a matter of controversy during the hearing before the Hearing Panel Subcom-

## II.

### Procedural Background

As stated above, in December 2006, the Investigative Panel of the Lawyer Disciplinary Board, upon a finding of probable cause, filed a Statement of Charges against respondent Blevins alleging violations of Rule 8.4.(a), (b) and (d) of the Rules of Professional Conduct. In his reply, the respondent asserted that he never requested or authorized any actions involving intimidation, violence, or the threat of violence, to collect the monies owed him. In that regard, respondent Blevins stated that Griffin was given insufficient information to locate the individuals and that some of the individuals were fictitious. The respondent asserted that, consequently, his actions did not result in harm to his former clients or to anyone else. According to respondent Blevins, he and Curtin were simply playing a role to either recover the $500 given to Griffin to locate Horbatak or to obtain something of equal value, the handgun, which respondent Blevins stated he wanted for protection.

On October 15 and 16, 2007, an evidentiary hearing was conducted before the Hearing Panel Subcommittee of the Lawyer Disciplinary Board. Respondent Blevins was represented by counsel. Subsequently, on March 24, 2008, the Subcommittee's Report and recommended sanctions were filed in this Court. The Subcommittee found that the allegations in the Statement of Charges were proven and that respondent Blevins violated Rule 8.4.(a), (b) and (d) of the Rules of Professional Conduct. The Subcommittee concluded:

> Respondent's conduct reflected adversely on his character and fitness to practice law and endangered his former clients and other members of the public for his own pecuniary gain. Respondent's conduct in

---

mittee. Officer Moore testified that a "throwaway" gun is synonymous with a "throw-down" gun, a weapon used in a crime that is difficult or impossible to trace. On the other hand, respondent Blevins denied using either term and stated that, in his understanding, a "throwaway" gun means a weapon of little or no value.

Respondent Blevins never obtained a handgun from Griffin or Curtin.

soliciting the services of a known felon to obtain a gun can be considered an attempt to violate 18 U.S.C. § 922(g)[4], and his participation in aiding and abetting a known felon in a scheme to extort money through violence and intimidation of individuals who owed respondent money can be considered conduct criminal in nature. * * *

Respondent's assertions that he did not know of Mr. Griffin's criminal background and that he was only "role playing" are not credible. It is not believable that any attorney, let alone one who has an extensive criminal defense practice, would only "pretend" to hire a known criminal capable of extreme violence and condone criminal behavior in an attempt to obtain a gun and to collect a debt. * * * Respondent could have availed himself of legal means to obtain a gun for himself and could have initiated civil suits against the individuals who owed him money. However, respondent chose not to employ those legal means to reach his goal.

In recommending sanctions for respondent Blevins' conduct, the Hearing Panel Subcommittee found no mitigating factors, other than the consideration that he had no disciplinary history. Moreover, the Subcommittee noted that the respondent testified that "he was not suffering from any physical, mental or substance abuse issues that would have impaired his judgment or his ability to practice law in February 2004." On the other hand, the Subcommittee determined the following to constitute aggravating factors: (1) that the respondent exhibited a dishonest and selfish motive in soliciting the services of a two-time felon to locate and extort money and obtain a handgun, (2) that the respondent refused to acknowledge the wrongful nature of his conduct and (3) that the respondent "has substantial experience in the practice of law, including an active criminal defense practice."

The respondent filed an objection to the Report and recommendations of the Hearing Panel Subcommittee. Thereafter, the Office of Disciplinary Counsel filed a letter indicating that it had no objection to the Report and recommendations. In April 2008, this Court entered an order establishing a briefing schedule and setting the case for argument.

## III.

### Standards of Review

█ In *Committee on Legal Ethics v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994), this Court took the opportunity to "resolve any doubt as to the applicable standard of review" in lawyer disciplinary cases. 192 W.Va. at 289, 452 S.E.2d at 380. Thus, syllabus point 3 of *McCorkle* holds:

A *de novo* standard applies to a review of the adjudicatory record made before the Committee on Legal Ethics of the West Virginia State Bar [currently, the Hearing Panel Subcommittee of the Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the Committee's recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the Committee's findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

Syl. pt. 1, *Lawyer Disciplinary Board v. Lakin*, 217 W.Va. 134, 617 S.E.2d 484 (2005); syl. pt. 1, *Lawyer Disciplinary Board v. Lusk*, 212 W.Va. 456, 574 S.E.2d 788 (2002); syl. pt. 3, *Lawyer Disciplinary Board v. Barber*, 211 W.Va. 358, 566 S.E.2d 245 (2002); syl. pt. 2, *Lawyer Disciplinary Board v. Turgeon*, 210 W.Va. 181, 557 S.E.2d 235 (2000), *cert. denied*, 534 U.S. 841, 122 S.Ct. 99, 151 L.Ed.2d 59 (2001).

The above standard of review is consistent with this Court's ultimate authority with regard to legal ethics matters in this State. As syllabus point 3 of *Committee on Legal Eth-*

**4.** Pursuant to 18 U.S.C. § 922(g) [1998], it shall be unlawful for any person convicted of a crime punishable by imprisonment for a term exceeding one year "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

*ics v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 783 (1985), holds: "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. pt. 2, *Barber, supra*; syl. pt. 3, *Lawyer Disciplinary Board v. Frame*, 198 W.Va. 166, 479 S.E.2d 676 (1996). *See also*, 2A M.J. *Attorney and Client* § 55 (1993), stating that the Supreme Court of Appeals of West Virginia "is the final arbiter of legal ethics problems."

■ Rule 3.7. of the West Virginia Rules of Lawyer Disciplinary Procedure provides that, in order to recommend the imposition of discipline of a lawyer, "the allegations of the formal charge must be proved by clear and convincing evidence." *Lusk, supra*, 212 W.Va. at 461, 574 S.E.2d at 793; syl. pt. 2, *Lawyer Disciplinary Board v. Cunningham*, 195 W.Va. 27, 464 S.E.2d 181 (1995). The various sanctions which may be recommended to this Court are set forth in Rule 3.15.[5], and, in making a recommendation or imposing discipline, certain factors are to be considered pursuant to Rule 3.16. As syllabus point 4 of *Office of Disciplinary Counsel v. Jordan*, 204 W.Va. 495, 513 S.E.2d 722 (1998), holds:

> Rule 3.16. of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: "In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [Supreme Court of Appeals of West Virginia] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted in-

tentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors."

Syl. pt. 2, *Lakin, supra*; syl. pt. 4, *Lawyer Disciplinary Board v. Battistelli*, 206 W.Va. 197, 523 S.E.2d 257 (1999). *See also*, syl. pt. 3, *Lawyer Disciplinary Board v. Keenan*, 208 W.Va. 645, 542 S.E.2d 466 (2000).

### IV.

### Discussion

■ This Court has conducted a complete review of the record in this matter, including the transcript and numerous exhibits with regard to the October 15 and 16, 2007, hearing before the Hearing Panel Subcommittee. As a result, this Court concludes that the findings of the Subcommittee are supported by reliable, probative and substantial evidence as that standard is expressed in *McCorkle*, and that the allegations in the Statement of Charges are proven by clear and convincing evidence. Moreover, this Court concludes that the Hearing Panel Subcommittee appropriately determined that the actions of respondent Blevins constituted misconduct under Rule 8.4.(a), (b) and (d), set forth above, of the Rules of Professional Conduct.

■ There does not exist in the Rules of Professional Conduct a "no harm, no foul" Rule. The respondent's assertion that his actions did not result, nor could have resulted, in actual harm to anyone notwithstanding, the record contains sufficient matters of proof to establish that the respondent and Curtin, his agent, solicited the services of Griffin, a two-time felon: (1) to locate or obtain a handgun without going through legal channels and (2) to intimidate, through

---

5. Rule 3.15. of the West Virginia Rules of Lawyer Disciplinary Procedure provides:

    A Hearing Panel Subcommittee may recommend or the Supreme Court of Appeals may impose any one or more of the following sanctions for a violation of the Rules of Professional Conduct or pursuant to Rule 3.14. [entitled "Grounds for discipline"]: (1) probation; (2) restitution; (3) limitation on the nature or extent of future practice; (4) supervised practice; (5) community service; (6) admonishment; (7) reprimand; (8) suspension; or (9) annulment. When a sanction is imposed the Hearing Panel Subcommittee may recommend and the Court may order the lawyer to reimburse the Lawyer Disciplinary Board for the costs of the proceeding. Willful failure to reimburse the Board may be punished as contempt of the Court.

violence or the threat of violence, certain individuals, including former clients, who owed the respondent money. Officer Moore of the Task Force testified before the Subcommittee as follows concerning Griffin:

Q. Did you have any reservations of using Mr. Griffin as a confidential informant?

A. Yes, I did. When I first met with Sheriff Burgoyne about using him, I expressed my concern that—his reputation and his past history. He was known, at least to me—I never worked any investigation involving him. This was all mostly before my time as a law enforcement officer. He has a reputation in the area as being kind of a tough guy. He had connections to organized crime in the past. I know he did federal time for drugs and weapons charges.

And I had dealt with him on—the only time I had dealt with him was on a domestic type of situation when I was a patrol officer, and I expressed my concerns to Sheriff Burgoyne that I didn't know if he would make a good informant. I wanted to make sure he was somebody we could—that he wouldn't mess up again while he was working for us. That was my biggest problem.[6]

Although respondent Blevins pressed upon the attention of the Subcommittee that he and Curtin were merely playing a role to persuade Griffin to either return the $500 or obtain the handgun, both the respondent and Curtin conceded in their testimony that, several days after the February 21, 2004, meeting, they concluded that the role playing may have been too effective and that Griffin might take action against some of the individuals discussed. Thus, both respondent Blevins and Curtin testified that Griffin was told the plan was called off.[7] As stated above, however, the Hearing Panel Subcommittee determined that the respondent's assertion that he was role playing was not credible.

■ Syllabus point 3 of *Committee on Legal Ethics v. Walker*, 178 W.Va. 150, 358 S.E.2d 234 (1987), holds:

In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession.

Syl. pt. 3, *Lawyer Disciplinary Board v. Keenan, supra*; syl. pt. 3, *Lawyer Disciplinary Board v. Swisher*, 203 W.Va. 603, 509 S.E.2d 884 (1998). Consistent with that principle is the earlier case of *In re Application by Daniel*, 153 W.Va. 839, 173 S.E.2d 153 (1970), syllabus point 2 of which confirms: "Disbarment of an attorney to practice law is not used solely to punish the attorney but is for the protection of the public and the profession." Syl. pt. 4, *Lawyer Disciplinary Board v. Sayre*, 207 W.Va. 654, 535 S.E.2d 719 (2000).

■ In its March 24, 2008, Report, the Hearing Panel Subcommittee stated that this type of conduct "has a dramatic impact on the public's confidence in the integrity of the Bar" and that the respondent's actions could have resulted in significant injury to his former clients and other individuals. The Subcommittee emphasized that the respondent failed to seek lawful avenues to recover the monies owed him and to obtain the gun he wanted. This Court is in full agreement with the Subcommittee's statements. However, in view of: (1) the elaborate nature of the plan communicated to Griffin, (2) its potential

---

6. During the proceedings below, respondent Blevins suggested that, inasmuch as Griffin was also being monitored by the Ohio Valley Drug Task Force, he could not have harmed anyone. However, as the above testimony of Officer Moore indicates, Griffin was unpredictable. In any event, the respondent did not know about the surveillance when he made the solicitations on February 21, 2004, which resulted in this disciplinary action.

7. As respondent Blevins testified:

And keep in mind within a course of two or three days when there was something in the back of my mind that suggested to me that maybe quite possibly this individual was somehow serious, it was called off, because at that time I figured, "Hey, maybe this guy is remotely serious."

tragic consequences, (3) the risk that at least some of the information concerning various individuals disclosed by the respondent in February 2004 may be disseminated throughout the criminal culture by Griffin and (4) the aggravating circumstances set forth by the Subcommittee, this Court is of the opinion that the recommendations of the Hearing Panel Subcommittee should be adopted, with the exception that respondent Blevins' license to practice law in this State be annulled rather than suspended.

As indicated above, this Court is particularly disturbed by the explanation advanced by the respondent herein for his behavior with Griffin. Specifically, the respondent contends that his actions constituted a somewhat fanciful role-playing of some sort. We fail to see how the claimed explanation in any way relates to respondent's attempt to recover money from Griffin. Respondent's role-playing story begs belief. Combined with the attempt to illegally procure a "throw-away" gun through a person whom respondent knew to be a convicted felon, the respondent's actions, whether or not violence actually resulted, are profoundly disturbing.

## V.

### Conclusion

This Court holds that the Statement of Charges against respondent Blevins was proven by clear and convincing evidence as required by the West Virginia Rules of Lawyer Disciplinary Procedure. As modified, the March 24, 2008, Report and recommendations of the Hearing Panel Subcommittee are adopted.

Accordingly, this Court orders: (1) that respondent Blevins' license to practice law in the State of West Virginia be annulled; (2) that, upon reinstatement, his private practice be supervised for a period of two years; (3) that respondent Blevins complete nine hours of Continuing Legal Education in ethics in addition to such ethics hours he is otherwise required to complete to maintain his active license to practice, said additional nine hours to be completed in the current reporting period after he is reinstated; and (4) that respondent Blevins pay the costs of these

proceedings. In addition, as a prerequisite to reinstatement, respondent Blevins shall be certified by a psychiatrist, to be selected jointly by the respondent and the Office of Disciplinary Counsel, that the respondent is in such condition that his ability to practice law will result in the protection of the public.

The mandate of this Court shall issue contemporaneously herewith.

License to Practice Law in West Virginia Annulled, and Additional Sanctions.

Justice ALBRIGHT did not participate in the issuance of this opinion.

Senior Status Justice McHUGH sitting by temporary assignment.

Supreme Court of Appeals of West Virginia.