**IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA**

**January Term 2014**

_____

No. 12-0528

_____

**FILED**

**February 12, 2014**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**LAWYER DISCIPLINARY BOARD,**
Petitioner

v.

**IRA M. HAUGHT,**
a member of The West Virginia State Bar,
**Respondent**

---

**Lawyer Disciplinary Proceeding**
**Nos. 10-05-226 and 10-05-274**

**LICENSE TO PRACTICE LAW IN WEST VIRGINIA**
**SUSPENDED FOR ONE YEAR**
**AND ADDITIONAL SANCTIONS**

---

**Submitted: January 22, 2014**
**Filed: February 12, 2014**

Jessica H. Donahue Rhodes, Esq.
Lawyer Disciplinary Counsel
Office of Disciplinary Counsel
Charleston, West Virginia
Counsel for Petitioner

Ancil G. Ramey, Esq.
Steptoe & Johnson PLLC
Huntington, West Virginia
Counsel for the Respondent

**The Opinion of the Court was delivered *Per Curiam*.**

**SYLLABUS BY THE COURT**

1.  "A *de novo* standard applies to a review of the adjudicatory record made before the Committee on Legal Ethics of the West Virginia State Bar [currently the Hearing Panel Subcommittee of the Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the Committee's recommendations while ultimately exercising its own independent judgment.  On the other hand, substantial deference is given to the Committee's findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record."  Syl. pt. 3, *Committee on Legal Ethics v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994).

2.  "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law."  Syl. pt. 3, *Committee on Legal Ethics v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984), *cert. denied*, 470 U.S. 1028 (1985).

***Per Curiam***:

This lawyer disciplinary proceeding concerning Ira M. Haught (hereinafter "Haught") is before this Court upon the Report and Recommendation of the Hearing Panel Subcommittee of the West Virginia Lawyer Disciplinary Board. The proceeding arose from a two count Statement of Charges filed by the Investigative Panel. Count I (No. 10-05-226) alleged violations of the *West Virginia Rules of Professional Conduct* with regard to the complaint filed by Gerald A. Heister, Chairman of the Board of National Rendevous and Living History Foundation, Inc., (hereinafter "NRLHF"). Count II (No. 10-05-274) alleged violations of the *Rules* with regard to the complaint filed by Jack D. Wright and Wanda R. Wright.

The Hearing Panel Subcommittee found that the allegations in both Counts of the Statement of Charges were proven by clear and convincing evidence. As a result, the Subcommittee recommends that this Court suspend Haught's license to practice law in this State for three years, with additional sanctions. Haught contests the findings and conclusions of the Hearing Panel Subcommittee, objects to the recommended disposition and asks that the Statement of Charges be dismissed.

While this Court affirms many of the findings of the Hearing Panel Subcommittee, we conclude that a suspension of one year is appropriate, rather than a three year suspension.

Nevertheless, this Court adopts and orders the additional sanctions set forth in the Subcommittee's Report and Recommendation.[1]

The circumstances surrounding the two ethics complaints are as follows.

## I. The Heister Complaint
## No. 10-05-226

Haught was admitted to The West Virginia State Bar in 1983 and practices law in Harrisville, Ritchie County, West Virginia. By written agreement dated April 30, 2008, Haught agreed to represent Linda B. Blizard and Richard E. Blizard, Jr., in a contract dispute

---

[1] The additional sanctions recommended by the Hearing Panel Subcommittee are as follows:

      a. Upon successful reinstatement to the practice of law, Haught shall sign and follow a plan of supervised practice for a period of two (2) years with a supervising attorney, consistent with the specifications set forth by the Office of Disciplinary Counsel;

      b. Upon successful reinstatement to the practice of law, Haught shall complete an additional nine (9) hours of Continuing Legal Education during the CLE time period he is reinstated in the area of ethics and office management, over and above that already required;

      c. Upon successful reinstatement to the practice of law, Haught shall have a certified public accountant audit his office accounting records for two (2) consecutive years, consistent with the specifications set forth by the Office of Disciplinary Counsel; and

      d. Haught shall pay the costs of these proceedings pursuant to Rule 3.15. of the *Rules of Lawyer Disciplinary Procedure*.

with NRLHF. Linda Blizard, an independent contractor performing accounting, reporting and financial management services for NRLHF, claimed that NRLHF wrongfully terminated her contract in 2007. Richard Blizard claimed that NRLHF wrongfully asserted a $1,300.00 debt against him.

Subsequent to Haught's April 2008 agreement to represent the Blizards, Linda Blizard allegedly withdrew, without authorization, money from a certificate of deposit owned by NRLHF. The record includes a copy of a check dated June 27, 2008, drawn on WesBanco Bank, Inc., and payable to NRLHF. The check, in the amount of $11,402.50, was endorsed in the name of Ms. Blizard and with the NRLHF initials. The record also includes a copy of a *second check* of the same date, drawn on WesBanco Bank, Inc., and payable to Ms. Blizard and Haught. The second check, also in the amount of $11,402.50, was endorsed on June 30, 2008, in the names of Ms. Blizard and Haught.

In July 2008, Haught filed an action on the Blizards' behalf in the Circuit Court of Ritchie County styled *Linda B. Blizard and Richard E. Blizard, Jr. v. National Rendevous and Living History Foundation, Inc*. The Blizards sought judgment against NRLHF for monies owed them, plus costs and attorney fees. Thereafter, the action was settled through mediation and dismissed by order entered in the circuit court in September 2009. The litigation did not address the NRLHF certificate of deposit.

3

On May 27, 2010, Gerald A. Heister, Chairman of the Board of NRLHF, filed an ethics complaint against Haught. Heister had not learned of the alleged conversion of the certificate of deposit by Linda Blizard until after the action against NRLHF was settled. Heister's complaint alleged that Ms. Blizard and Haught cashed the second check in the amount of $11,402.50, and that, "with the possible knowledge of Mr. Haught," the money was to be used to pay the Blizards' legal fees in the action against the NRLHF.

Haught responded by letter dated June 18, 2010, in which he stated that the issues raised in the ethics complaint had been resolved through the settlement and dismissal of the civil action against NRLHF. Although the civil action had not specifically addressed the alleged conversion of the certificate of deposit by Linda Blizard, Haught subsequently emphasized that one of the settlement documents in the action released the Blizards from all past, present and future claims, known or unknown.

Later, however, Disciplinary Counsel asked Haught to respond to the allegations (1) that he endorsed and cashed the $11,402.50 check "from an account belonging to the National Rendezvous and Living History Foundation" and (2) that the money was to be used to pay Haught's legal fees. In a letter dated August 18, 2010, Haught acknowledged that he had received disputed funds from Richard and Linda Blizard in the amount of $11,402.50. The letter further stated:

4

I did not cash a check in this matter. I do not recall if the check required my endorsement before it was cashed by Mr. and Mrs. Blizard. These funds were held by me until the case was settled and then these funds were released to Richard and Linda Blizard.

None of these funds were used for the payment of attorney fees during this litigation.

On December 7, 2010, Haught gave a sworn statement before the Investigative Panel of the Lawyer Disciplinary Board. Haught testified that, in June 2008, the Blizards brought $11,402.50 in cash to his office to hold, pending the Blizards' litigation against NRLHF. Denying that the money was for attorney fees, Haught indicated that the Blizards brought the cash to his office in connection with Linda Blizard's claim against NRLHF for unpaid compensation.[2] Haught testified before the Investigative Panel that he *did not* deposit the money in his IOLTA account maintained at the Huntington National Bank.[3] Instead, he kept the money in his office safe. Haught testified:

---

[2] Haught did not remember seeing either of the two $11,402.50 checks dated June 27, 2008, and did not have copies of the checks in his files. However, when shown the second check payable to him and Linda Blizard, Haught acknowledged that his signature appeared on the reverse side. Haught indicated that he must have endorsed the check in the Blizards' presence, and that, soon after, the Blizards returned and gave him the $11,402.50 in cash to hold on their behalf.

[3] "IOLTA" is an acronym for Interest on Lawyer Trust Accounts. An IOLTA account for the safekeeping of client funds that are "expected to be held for a brief period" is addressed under Rule 1.15. of the *West Virginia Rules of Professional Conduct*. *See Lawyer Disciplinary Board v. Morgan*, 228 W.Va. 114, 120 n. 11, 717 S.E.2d 898, 904 n. 11 (2011).

5

Q. Okay. When you deposited the disputed funds, was that . . .
deposited into your IOLTA account?

A. No. Actually, they brought in cash.

Q. Okay.

A. And I held that cash in my safe in the office.

Q. Okay. Is that your normal practice?

A. No. Normally, it always goes in the trust account, but they wanted
me to hold it in a safe. So, I did that.

Q. The clients wanted you to hold it in a safe?

A. Yes.

Q. Okay.

A. Because I told them there was a good possibility there would be a
motion made for it to be tendered to the Clerk to be held until the case was
resolved, and that was never done.

Finally, Haught testified on December 7, 2010, that, when the action against NRLHF settled, he returned the money to the Blizards, and they paid an outstanding invoice for attorney fees in the amount of $4,340.00. Haught stated that the Blizards were satisfied with his services.

Following Haught's sworn statement, Disciplinary Counsel asked Haught to provide "a receipt for the cash deposit" by Linda Blizard in the amount of $11,402.50. On December 14, 2010, Haught responded that, upon a review of his receipt books for the year 2008, he could not find a copy of a receipt written to Linda Blizard.

6

Thereafter, Disciplinary Counsel obtained, by subpoena, a copy of the records of Haught's IOLTA account at the Huntington National Bank for the period May 2008 through September 2009. The bank records reveal that on June 30, 2008, Haught deposited $11,402.50 in his IOLTA account. The bank records also reveal that, much later, on September 11, 2009, Haught wrote a check from his IOLTA account to the Blizards in the amount of $7,062.50. Specifically, Haught's invoice for attorney fees, upon the settlement of the action against NRLHF, indicates that $4,340.00 in fees were subtracted from the $11,402.50, leaving a $7,062.50 remainder for the Blizards.

Generally, Haught's IOLTA account records show a significant number of deposits and withdrawals for the period May 2008 through September 2009. The records show in excess of 90 checks drawn on the account, with approximately one-third of the checks made payable to Haught personally and 12 checks payable to an entity known as the Haught Family Trust. The Haught Family Trust, established by Haught's parents, manages, buys and sells real estate.

On April 27, 2012, the Investigative Panel filed a Statement of Charges against Haught. Count I, No. 10-05-226, addressed the complaint filed by Heister on behalf of NRLHF. That Count alleged that, after Haught deposited the $11,402.50 in his IOLTA account on June 30, 2008, the bank statement for the period immediately following (July 1,

7

2008 to July 31, 2008) revealed an account balance of only $1,778.60, less than the amount which should have been in the account at that time, and with no checks for that period payable to the Blizards or the NRLHF.[4]

Consequently, Count I alleged that, because Haught failed to keep the $11,402.50 he received from Linda Blizard in his IOLTA account and converted those funds for his personal use,[5] Haught violated Rule 1.15.(a) and Rule 8.4.(b), (c) and (d) of the *West Virginia Rules of Professional Conduct*.[6]   In addition, Count I alleged that Haught lied to Disciplinary

---

[4] The bank statement for the period July 1, 2008, to July 31, 2008, however, includes two checks, one payable to the Haught Family Trust in the amount of $5,254.51 and the other payable to Haught in the amount of $5,000.00.

[5] Paragraph 10 of the Statement of Charges alleged that Haught failed to keep the $11,402.50 in his IOLTA account and that Haught converted those funds for his personal use.  In his Answer to the Statement of Charges, Haught stated: "Respondent admits that he failed to keep the funds he received from Linda Blizard in his firm's IOLTA account at the request of his client.  Respondent denies the remaining allegations contained in paragraph 10."

[6] Rule 1.15.(a), concerning the safekeeping of property, states:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property.  Funds shall be kept in a separate account designated as a "client's trust account" in an institution whose accounts are federally insured and maintained in the state where the lawyer's office is situated, or in a separate account elsewhere with the consent of the client or third person.  Other property shall be identified as such and appropriately safeguarded.  Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

8

Counsel in an effort to avoid detection of his conversion of funds. Haught was, therefore, charged with violating Rule 8.1.(a) of the *Rules of Professional Conduct*.[7]

On December 5, 2012, an evidentiary hearing was conducted, and on June 6, 2013, the Hearing Panel Subcommittee filed its report and recommendation. As to Count I of the Charges, the Subcommittee confirmed that bank records demonstrated that Haught deposited the $11,402.50 in his IOLTA account on June 30, 2008, and that, by July 31, 2008, the account balance was only $1,778.60, less than the amount which should have been in the account at that time, and with no checks for that period payable to the Blizards or the NRLHF.

As to Haught's return of funds to the Blizards after the settlement of their action against the NRLHF, the Hearing Panel Subcommittee confirmed that Haught wrote a check from his IOLTA account to the Blizards on September 11, 2009, for $7,062.50. However, the Subcommittee found that the bank statement for the period immediately *preceding* that check

_____

Rule 8.4.(b), (c) and (d) states that it is professional misconduct for a lawyer to:

     (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
     (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
     (d) engage in conduct that is prejudicial to the administration of justice[.]

[7] Rule 8.1.(a) provides that a lawyer, in connection with a disciplinary matter, shall not "knowingly make a false statement of material fact."

9

(August 1, 2009 to August 31, 2009) revealed an account balance of only $1,818.47. The

bank records further revealed that on September 10, 2009, Haught deposited $9,600.27 in the

account the day before he wrote the Blizards' check. The Subcommittee found that Haught

was able to write the September 11, 2009, check to the Blizards because of the September 10,

2009, deposit.

The Hearing Panel Subcommittee concluded that the evidence was clear and

convincing that Haught violated the *Rules of Professional Conduct* referenced in the

Statement of Charges. Haught violated Rule 1.15.(a) by failing to maintain the Blizard funds

in his client trust account. With respect to Rule 8.4.(b), (c) and (d), the Subcommittee stated:

> The HPS does not find credible Respondent's claim he kept the
> Blizards' money as cash in his safe. This is because it is undisputed
> Respondent received the $11,402.50 as a check payable to Linda Blizard and
> him. Respondent endorsed the check and deposited it to his IOLTA account.
> There was no legitimate reason for this account to be converted to cash and
> placed in Respondent's safe. * * * The only records produced show
> disbursements from Respondent's IOLTA account after the deposit of the
> Blizard money for Respondent's other business or Haught Family Trust
> purposes. By July 31, 2008, thirty days after the Blizard deposit, the account
> balance was $1,778.60. The evidence, therefore, is clear and convincing that
> Respondent converted the Blizard money for his own personal use.

Finally, concluding that Haught violated Rule 8.1.(a), the Subcommittee found:

> Respondent's statements that he received the [$11,402.50] in cash

10

and did not deposit it to his IOLTA account are material and false. Respondent's claim that he mistakenly believed this to be true is no defense. Respondent is charged with the knowledge of his own records.

## II. The Wright Complaint
## No. 10-05-274

On July 6, 2010, an ethics complaint was filed against Haught by Jack D. Wright and Wanda R. Wright. The complaint stated that on July 19, 2006, Haught prepared a deed for the Wrights who were buying tracts of real property in Doddridge County. According to the Wrights, Haught mistakenly left out the mineral interests as part of the purchase. The complaint alleged that the Wrights did not discover the omission until they attempted to update the county tax ticket. Their repeated attempts to speak with Haught, thereafter, were unsuccessful. Subsequent evidence submitted in this proceeding revealed that many of the calls the Wrights made to Haught's office were never returned. The complaint further alleged that it was not until May 13, 2010, after Wanda Wright threatened to file an ethics complaint, that Haught provided the Wrights with a copy of a corrective deed. However, the seller, L. L. Tonkin, has never signed the corrective deed. Finally, the complaint alleged that Haught continued to be unresponsive to the Wrights' inquiries.

Haught responded to the complaint by letter to Disciplinary Counsel dated July 20, 2010, in which he maintained that his client in the transaction was the seller, L. L. Tonkin, rather than the Wrights. In the letter, Haught stated that he had been retained by Tonkin on

11

April 4, 2005, to prepare a deed for the sale of the Doddridge County property to an individual named David L. Thompson. However, Thompson never came up with the money to complete the purchase, and the sale fell through. Subsequently, in July 2006, Tonkin asked Haught to prepare a deed for the sale of the same property to the Wrights. In a letter dated July 28, 2006, written "on behalf of L. L. Tonkin," Haught told the Wrights that Tonkin had signed the deed and that the Wrights would need to forward $14,282.60 to complete the sale.[8] After receiving the $14,282.60 from the Wrights, Haught recorded the deed on August 14, 2006 and closed his office file.

Haught's letter to Disciplinary Counsel further stated that, in January 2010, Wanda Wright called and requested a corrective deed to include omitted mineral interests. Haught prepared a corrective deed and forwarded it to Tonkin on January 14, 2010. Tonkin did not respond.[9] Haught's letter to Disciplinary Counsel concluded by stating that he was never retained by the Wrights and simply "attempted to obtain the Corrective Deed on their behalf pursuant to their request."

---

[8] The $14,282.60 consisted of the purchase price in the amount of $14,000.00, plus $61.60 for the transfer tax stamps, $21.00 for the recording fee, $100.00 for the preparation of the deed and a $100.00 closing fee. According to the Wrights, of the $14,000.00 purchase price, $170.00 was for the mineral interests.

[9] The record includes a copy of the corrective deed, made on January 12, 2010. The corrective deed, unsigned by Tonkin, shows a conveyance to the Wrights of nine tracts in Doddridge County. The omission of the mineral interests pertained to the first tract described therein.

In reply, the Wrights sent a letter to Disciplinary Counsel on July 26, 2010, stating that they, rather than Tonkin, had initiated contact with Haught concerning the transaction and that they, and not Tonkin, had retained Haught's services. Moreover, the Wrights stated that Wanda Wright had been leaving messages with Haught's office about the problem with the mineral interests since 2007.

In his sworn statement of December 7, 2010, Haught stated that Tonkin, Thompson and the Wrights had been partners in previous business matters and that Thompson had been referred to him through an entity known as Pre-Paid Legal Services, Inc. Although Thompson paid Haught $600.00 for legal services, Thompson never came up with the money to complete the purchase of the Doddridge County tracts. Thereafter, Haught was first contacted by Tonkin and then by the Wrights concerning the property. Haught stated that he considered the seller, Tonkin, to be his client and that his notes from Tonkin indicated that the conveyance to the Wrights was for the surface only. Finally, Haught stated that he did the corrective deed at Wanda Wright's request because the Wrights had possibly communicated with Tonkin concerning the mineral interests. Tonkin, however, never signed the corrective deed.[10]

---

[10] By letter dated February 16, 2010, to Disciplinary Counsel, Haught stated that he did not have any written legal representation contracts for Tonkin, Thompson or the Wrights. Haught explained: "A written representation contract was never prepared due

In addition to his sworn statement of December 7, 2010, the record includes a number of documents, provided by Haught, concerning the sale of the Doddridge County property. One of the documents is a file card from Haught's office showing David L. Thompson as the client (referred by Pre-Paid Legal Services, Inc.) and L. L. Tonkin as the adverse party. The documents also include a number of telephone message slips. The message slips reveal that Wanda Wright called in June 2006, inquiring about the cost of a deed for the same property Thompson had attempted to purchase. Other message slips reveal that (1) in July 2006, Wanda Wright called to ask when the deed would be ready, (2) in August 2008, the Wrights called, suggesting that there were problems with the tax tickets and the deed and (3) in May [presumably 2010], Wanda Wright called, stating that she needed to hear "something positive" or she would call the State Bar.

In the Statement of Charges filed by the Investigative Panel, Count II, No. 10-05-274, addressed the complaint filed by the Wrights. Count II alleged that, in both his response to the Wrights' ethics complaint and his December 7, 2010, sworn statement, Haught lied in an effort to avoid detection of who his client was, and, therefore, violated Rule 8.1.(a), prohibiting false statements of material fact, and Rule 8.4.(c), prohibiting conduct involving

---

to the fact that I was only requested by the parties to prepare a deed and then thereafter, to modify the previously prepared deed."

dishonesty, fraud, deceit or misrepresentation.[11]

Following the December 5, 2012, evidentiary hearing, the Report and Recommendation of June 6, 2013, was filed by the Hearing Panel Subcommittee. Concluding that an attorney-client relationship existed between Haught and the Wrights, the Subcommittee stated:

> [I]n his verified response to the Wrights' complaint, Respondent stated, unequivocally, "[i]n the month of July 2006 L. L. Tonkin requested I prepare a Deed . . . to Jack D. and Wanda R. Wright;" and that he was "never retained by Jack D. Wright and/or Wanda Wright to perform any work on their behalf . . . ."
>
> Next in his December 7, 2010 sworn statement, Respondent stated he prepared the deed for Mr. Tonkin, not the Wrights. He also stated he was contacted first about the deed by Mr. Tonkin.
>
> Then by the time of the hearing before the HPS, Respondent could not recall whether he had first been contacted by the Wrights or Mr. Tonkin. He now has no specific recollection of talking to Mr. Tonkin about the Wright deed.
>
> Based on Respondent's testimony at the December 5, 2012 hearing and his client records, the evidence is clear and convincing that Respondent knowingly made false statements of material fact in his verified response and sworn statement about the nature of his relationship with Jack and Wanda Wright when he stated Mr. Tonkin requested he prepare the Wright deed and that he was first contacted by Mr. Tonkin. These statements violated RPC 8.1(a). These statements also misrepresented the existence of the attorney-client relationship in violation of RPC 8.4(c).

---

[11] The provisions of Rule 8.1.(a) and Rule 8.4.(c) are set forth in n. 6 and n. 7 *supra*.

## III. Standards of Review

In *Committee on Legal Ethics v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994), this Court took the opportunity to "resolve any doubt" concerning the applicable standard of review in lawyer disciplinary cases. 192 W.Va. at 289, 452 S.E.2d at 380. Syllabus point 3 of *McCorkle* holds:

> A *de novo* standard applies to a review of the adjudicatory record made before the Committee on Legal Ethics of the West Virginia State Bar [currently the Hearing Panel Subcommittee of the Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the Committee's recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the Committee's findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

*Accord* syl. pt. 1, *Lawyer Disciplinary Board v. Santa Barbara*, 229 W.Va. 344, 729 S.E.2d 179 (2012); syl. pt. 1, *Lawyer Disciplinary Board v. Blevins*, 222 W.Va. 653, 671 S.E.2d 658 (2008). *See also In re: L.E.C.*, 171 W.Va. 670, 672, 301 S.E.2d 627, 629 (1983) (Absent a mistake of law or arbitrary assessment of facts, recommended sanctions in legal ethics cases are to be given substantial consideration.)

The above standard of review is consistent with this Court's ultimate authority with regard to legal ethics matters in this State. Syllabus point 3 of *Committee on Legal Ethics v.*

*Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984), *cert. denied*, 470 U.S. 1028 (1985), states:

"This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." *Accord* syl. pt. 3, *Lawyer Disciplinary Board v. Artimez*, 208 W.Va 288, 540 S.E.2d 156 (2000).

Rule 3.7. of the *West Virginia Rules of Lawyer Disciplinary Procedure* provides that, in order to recommend the imposition of discipline of a lawyer, "the allegations of the formal charge must be proved by clear and convincing evidence."[12]

### IV. Discussion
### The Heister Complaint
### No. 10-05-226

Although the record in this matter is voluminous, the essential facts favorable and unfavorable to Haught, in relation to the Statement of Charges, are straightforward. In his sworn statement before the Investigative Panel, Haught denied that he deposited the $11,402.50 from the Blizards into his IOLTA account. Rather, Haught stated that, following

---

[12] This Court previously required that ethics charges be proved by "full, preponderating and clear evidence." The current standard, pursuant to Rule 3.7. is "clear and convincing." *See Lawyer Disciplinary Board v. McGraw*, 194 W.Va. 788, 796-97, 461 S.E.2d 850, 858-59 (1995). *See also O'Dell v. Stegall*, 226 W.Va. 590, 608, 703 S.E.2d 561, 579 (2010) (discussing various definitions of the phrase "clear and convincing" and noting that, as the highest possible standard of civil proof, "clear and convincing" evidence is more than a mere preponderance but less than proof beyond a reasonable doubt).

his endorsement of the June 27, 2008, check, the Blizards "brought in cash," and he held the $11,402.50 in his office safe at the Blizard's request until the litigation against NRLHF was over. Following Haught's sworn statement, Disciplinary Counsel asked Haught to provide "a receipt for the cash deposit" by Linda Blizard in the amount of $11,402.50. On December 14, 2010, Haught responded that, upon a review of his receipt books for the year 2008, he could not find a copy of a receipt written to Linda Blizard.

Records from the Huntington National Bank, subsequently obtained, revealed, however, that Haught deposited the $11,402.50 in his IOLTA account on June 30, 2008. Bank records also revealed that, for the period immediately following the $11,402.50 deposit, the IOLTA account balance was only $1,778.60, less than the amount which should have been in the IOLTA account at that time, and with no checks for that period payable to the Blizards or the NRLHF. During that period, bank records showed a check payable to the Haught Family Trust and another check payable to Haught. *See* n. 4 *supra*.

In his Answer to the Statement of Charges, Haught stated that he "failed to keep the funds he received from Linda Blizard in his firm's IOLTA account at the request of his client," apparently maintaining that $11, 404.50 in cash was placed in his safe at the request of the Blizards.

18

The evidence shows that, in early 2008, the Blizards made an initial $500.00 payment to Haught, from their own funds, for attorney fees. When the litigation against the NRLHF was settled in 2009, Haught deducted the balance of the attorney fees owed to him from the $11,402.50 and returned the remainder to the Blizards in the amount of $7,062.50. The $7,062.50 was returned to the Blizards by check dated September 11, 2009, from Haught's IOLTA account. However, as the Subcommittee found, but for a deposit of $9,600.27 into the IOLTA account the day before, Haught would not have been able to write the check to the Blizards.

During the December 5, 2012, hearing before the Subcommittee, Haught's explanation concerning his IOLTA account was somewhat convoluted. Haught testified that, because of issues with the Internal Revenue Service, an envelope was kept in his office safe which contained large amounts of cash belonging to the Haught Family Trust. Haught indicated that, as the attorney for the Haught Family Trust, additional funds belonging to the Family Trust were also kept in the IOLTA account. According to Haught, because the Blizards asked that the $11,402.50 be held in cash in the safe, Haught simply transferred $11,402.50 from the Haught Family Trust envelope in the safe to a new envelope in the safe marked as belonging to the Blizards. In return, the $11,402.50 which Haught had deposited into the IOLTA account was, therefore, considered to be funds of the Haught Family Trust.

19

When the Blizard's litigation against the NRLHF settled in 2009, Haught testified that he reversed the process. He made a deposit of $9,600.27 into his IOLTA account, probably from Haught Family Trust funds, and wrote the Blizards a check from his IOLTA account for $7,062.50. During the December 5, 2012, hearing, the Blizards testified that they were satisfied with Haught's services.

In Haught's favor, the evidence does not show any participation by Haught in the alleged conversion by Linda Blizard of the NRLHF certificate of deposit or any evidence that the Blizards, or Haught, earmarked the disputed money simply to retain Haught or pay his attorney fees.[13] In addition, the Subcommittee asserted that Haught stated falsely that the issues surrounding the certificate of deposit, allegedly converted by Linda Blizard, had been resolved, in 2009, through the settlement and dismissal of the NRLHF litigation. The Subcommittee's assertion, however, is unpersuasive because, as part of the settlement of the NRLHF litigation, the Blizards were released from all past, present and future claims, known and unknown. Finally, nothing in the record supports the Subcommittee's conclusion that

---

[13] Heister, who filed the ethics complaint as Chairman of the Board of NRLHF, testified before the Subcommittee:

> Q. And so at the time that you filed the complaint, you weren't sure whether or not Mr. Haught had knowledge as to either the source of the funds or whether or not they were to be used for his legal fees; is that correct?
> A. I had no proof. No. No, Sir.

Haught violated Rule 8.4.(b) of the *Rules of Professional Conduct*. That Rule sets forth an ethics violation for the commission of a criminal act. Neither the Statement of Charges nor the Subcommittee's Report and Recommendation identified any criminal act allegedly committed by Haught, and the record contains no evidence of such a violation.

Nevertheless, the evidence does not support Haught's assertion that the Blizards instructed him to hold the $11,402.50 in cash in his office safe. Both Linda Blizard and Richard Blizard testified that they did not recall telling Haught how to hold the money.[14] During the December 5, 2012, hearing, Linda Blizard stated that she assumed Haught "would put it into safekeeping – in his escrow account, like other lawyers do."

Moreover, although Haught maintains that records of his IOLTA transactions between May 2008 and September 2009 were adequately established by the bank records obtained from the Huntington National Bank, he also maintained during his testimony that his actions concerning the Blizards' $11,402.50, vis-a-vis the Haught Family Trust, were reflected in the

---

[14] Richard Blizard testified during the December 5, 2012, hearing:

> Q. Okay. Was there – did you provide any instructions to Mr. Haught as to how to hold that money?
> A. No, we did not.
> Q. Did you give him that money in cash?
> A. No, we did not.

Family Trust records. However, Haught was unable to provide any documentation from the Haught Family Trust in that regard.[15]

The evidence pertaining to the Statement of Charges shows that on June 30, 2008, Haught deposited the Blizards' $11,402.50 into his IOLTA account, and that on September 11, 2009, he returned the balance due to the Blizards from his IOLTA account, by check. However, soon after the 2008 deposit, as well as immediately before the 2009 refund, less than $11,402.50 could be found in the account. In view of the testimony of Linda Blizard and Richard Blizard, the Subcommittee's conclusion is well-taken that there was no legitimate reason for the $11,402.50 to be converted to cash and kept in Haught's office safe. In any event, if the money was held in the safe, its transfer back and forth between the Haught Family Trust and Blizard envelopes is disturbing.

Furthermore, the last minute deposit of $9,600.27 into the IOLTA account on

---

[15] On January 16, 2013, the Hearing Panel Subcommittee entered an order closing the record in this matter. The order stated:

> At the conclusion of the public hearing held on December 5, 2012, the Hearing Panel Subcommittee granted the motion of Disciplinary Counsel that the record be held open and that Respondent be ordered to produce records showing the transfer of money in the Haught Family Trust Account. Thereafter, in his Response to Request for Supplemental Document Production dated January 10, 2013, Respondent advised he has no documents responsive to the request by the Office of Disciplinary Counsel.

September 10, 2009, in order to return the balance due to the Blizards on September 11, 2009, does not excuse the failure to safeguard the Blizards' funds within the meaning of Rule 1.15.(a) concerning the safekeeping of property. In *Lawyer Disciplinary Board v. Blevins*, 222 W.Va. 653, 659, 671 S.E.2d 658, 664 (2008), this Court emphasized: "There does not exist in the Rules of Professional Conduct a 'no harm, no foul' Rule." The brief filed by Disciplinary Counsel explains:

> While the Blizards had no complaint about the representation of Respondent, they were unaware of how their funds were not being safeguarded by Respondent. The fact that Respondent just happened to deposit additional funds into his IOLTA account and pay the Blizards their money is not an excuse for Respondent's failure to properly maintain his client trust account.

The record does not support a finding that Haught committed a criminal act or converted the Blizards' money for his personal use. The testimony during the December 5, 2012, hearing indicated that checks payable to Haught from the IOLTA account between May 2008 and September 2009 pertained to work he was doing as counsel for the Haught Family Trust and for other clients. We do not disturb, however, the conclusion of the Subcommittee that, based on the bank records, Haught lacked credibility in providing an initial sworn statement denying that he deposited the $11,402.50 into his IOLTA account and insisting that he received the money in cash. After the money was deposited into the IOLTA account, it was not kept in the account.

23

Violations of Rules 1.15.(a); 8.4.(c) and (d) and 8.1.(a) are proved by clear and convincing evidence.

## The Wright Complaint
## No. 10-05-274

In his July 20, 2010, letter to Disciplinary Counsel, Haught stated that he had been retained by the seller, Tonkin, to prepare a deed to convey the Doddridge County property to David L. Thompson. Thompson never came up with the money to complete the transaction. Nevertheless, Thompson paid Haught $600.00 for legal services. Moreover, the documents of record include the file card from Haught's office showing Thompson as the client and Tonkin as the adverse party. Thompson was referred to Haught through Pre-Paid Legal Services, Inc.

Haught contends that he considered Tonkin to be his client, rather than Thompson or the Wrights, because Tonkin was the seller, "and in real estate transactions, generally the seller is responsible for the deed preparation."[16] During the hearing before the Subcommittee,

---

[16] During the December 5, 2012, hearing before the Subcommittee, Haught testified:

> A. . . . Because the seller is responsible for deed prep, so all I did was the deed so I assumed - - that's why I assumed [Tonkin is] my client.
> Q. So you just assumed that he was your client then?
> A. Yes.
> Q. Okay. Who paid you to prepare the deed with Mr. Thompson?

24

however, Thompson testified that he initiated contact with Haught, paid his fee for legal services, and believed that Haught was his attorney.

In his July 20, 2010, letter to Disciplinary Counsel, Haught also stated that, after the conveyance to Thompson failed, Tonkin requested that Haught prepare a deed for the sale of the same property to the Wrights. Similarly, in his December 7, 2010, sworn statement, Haught testified that he was first contacted by Tonkin, then by the Wrights, and that he considered Tonkin to be his client.

According to Haught, the Wrights never retained him as their attorney. Haught maintains that he subsequently prepared the corrective deed as an accommodation because, as Haught later testified, he thought the Wrights may have been in contact with Tonkin concerning the omitted mineral interests. In addition, Haught points out that earlier, in December 2009, Wanda Wright retained another attorney who prepared a corrective deed but

---

A. In both deals with Mr. Tonkin, he had a net that he had to have. Had the party had to – had to pay all the expenses, so both Mr. Thompson and the Wrights paid the expenses including the transfer tax stamps and recording fees.
Q. So Mr. Thompson paid your fee in his matter?
A. Yes.
Q. And Mr. and Mrs. Wright paid your fee in their matter?
A. Yes.
Q. Okay. And you've never received any payment from Mr. Tonkin?
A. No.

25

was unable to obtain Tonkin's signature.[17]  The corrective deed that Haught prepared was made subsequently in January 2010.  Haught emphasizes (1) that he and the Wrights' other attorney pursued a similar course of action, (2) that the Wrights declined to institute litigation against Tonkin over the mineral interests and (3) that the Wrights did not file an ethics complaint against the other attorney.

As Haught correctly states, he is not charged in this matter with violating the *Rules of Professional Conduct* with regard to the disputed mineral interests.  Rather, the Statement of Charges filed by the Investigative Panel alleges that Haught engaged in untruths in an effort to avoid detection of who his client was.

Contrary to his July 20, 2010, letter and December 7, 2010, sworn statement, Haught testified before the Hearing Panel Subcommittee that he did not remember whether it was Tonkin or the Wrights who first contacted him about the conveyance.  Haught told the Subcommittee:

> Q. So Ms. Wright's statement that she contacted – she initiated the contact, you disagree with that?

---

[17]  Wanda Wright testified before the Subcommittee:

> Trying to get it straightened out.  December of 2009, I finally gave up on him doing anything, so I had another lawyer to write a corrective deed to see if Mr. Tonkin would sign.  Well, by this time, he refused to sign.

26

A. I don't have any basis to disagree with it.

Q. Okay.

A. I don't recall who contacted me first.

Wanda Wright testified before the Subcommittee that, after her initial contact with Haught in June 2006 concerning the Doddridge County property, Haught informed her, in July 2006, that Tonkin had signed the deed and that the Wrights should forward the funds to complete the sale. The Wrights did so, and the deed was recorded in August 2006. In 2008, the Wrights notified Haught about problems with the tax tickets and the deed. The problems concerned the issue of mineral interests. Finding Haught unresponsive to their calls, the Wrights in 2009 attempted, unsuccessfully, to resolve the problem by contacting another attorney. Although Haught later prepared a corrective deed in January 2010, a copy thereof was not provided to the Wrights until May 2010, after Wanda Wright threatened to file an ethics complaint. Wanda Wright testified before the Subcommittee that she reasonably believed that Haught was her attorney. Haught testified that, in retrospect, he should have called Wanda Wright on more occasions. Nothing in the record indicates that Haught ever told the Wrights that he was not representing them.

Although Haught asserts that the determination of an attorney-client relationship is a question of law, such a determination can only be made in the context of the antecedent facts. *See State ex rel. DeFrances v. Bedell*, 191 W.Va. 513, 517, 446 S.E.2d 906, 910 (1994) ("The

27

determination of the existence of an attorney-client relationship depends on each case's specific facts and circumstances.").[18]  In this matter, this Court is of the opinion that the conclusion of the Hearing Panel Subcommittee, that an attorney-client relationship existed between Haught and the Wrights should not be disturbed.  Furthermore, we agree with the Subcommittee's conclusion that:

> Based on Respondent's testimony at the December 5, 2012 hearing and his client records, the evidence is clear and convincing that Respondent knowingly made false statements of material fact in his verified response and sworn statement about the nature of his relationship with Jack and Wanda Wright when he stated Mr. Tonkin requested he prepare the Wright deed and that he was first contacted by Mr. Tonkin.  These statements violated RPC 8.1(a).  These statements also misrepresented the existence of the attorney-client relationship in violation of RPC 8.4(c).

## V. Sanctions and Conclusion

Where discipline is appropriate, the sanctions which the Hearing Panel Subcommittee may recommend to this Court are found in Rule 3.15.  Those sanctions include (1) probation, (2) restitution, (3) limitation on the nature or extent of future practice, (4) supervised practice, (5) community service, (6) admonishment, (7) reprimand, (8) suspension or (9) annulment.

---

[18]  The Subcommittee's Report and Recommendation states:

> Respondent argues the existence of an attorney-client relationship is a matter of law and therefore one cannot make a material statement of fact about this issue.  However, what the HPS finds is that Respondent made false statements of fact concerning his relationship with the Wrights and these statements are material to determining whether an attorney-client relationship existed.

Pursuant to Rule 3.16. of the *Rules of Lawyer Disciplinary Procedure*, the following shall be

considered in imposing a sanction:

> (1) whether the lawyer has violated a duty owed to a client, to the public, to
> the legal system, or to the profession; (2) whether the lawyer acted
> intentionally, knowingly, or negligently; (3) the amount of the actual or
> potential injury caused by the lawyer's misconduct; and (4) the existence of
> any aggravating or mitigating factors.

*See* syl. pt. 4, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W.Va. 495, 513 S.E.2d

722 (1998) (emphasizing the provisions of Rule 3.16. in mandating discipline in legal ethics

cases).[19]

In the current matter, Haught's conduct with regard to the Blizards and the Wrights did

not conform to the expectations of the profession.  Among the aggravating factors found by

the Subcommittee were Haught's tendency to present an evolving story when confronted with

new facts; his misrepresentation of whether he had an attorney-client relationship with David

L. Thompson; and Haught's failure to adequately communicate with Wanda Wright.  The

---

[19] With regard to aggravating or mitigating factors under Rule 3.16., syllabus point
4 of *Lawyer Disciplinary Board v. Scott*, 213 W.Va. 209, 579 S.E.2d 550 (2003), states:
"Aggravating factors in a lawyer disciplinary proceeding are any considerations or factors
that may justify an increase in the degree of discipline to be imposed."  By contrast,
syllabus point 2 of *Scott* states that mitigating factors in a lawyer disciplinary proceeding
"are any considerations or factors that may justify a reduction in the degree of discipline
to be imposed."  *Accord* syl. pts. 5, 6, *Lawyer Disciplinary Board v. Martin*, 225 W.Va.
387, 693 S.E.2d 461 (2010).

mitigating factors found by the Subcommittee were that Haught has been practicing law since 1983 with no prior discipline assessed by this Court and that, under Count I of the Statement of Charges, the Blizards suffered no financial loss.

Added thereto is this Court's determination, concerning Count I, that the record does not support a finding that Haught committed a criminal act or converted the Blizards' money for his personal use. The testimony during the December 5, 2012, hearing indicated that checks payable to Haught from the IOLTA account between May 2008 and September 2009 pertained to work he was doing as counsel for the Haught Family Trust and for other clients. With respect to Count II, Haught was not charged with violating the *Rules of Professional Conduct* with regard to whether the disputed mineral interests should, or should not, have been omitted from the conveyance to the Wrights.

Accordingly, this Court concludes that a suspension of Haught's license for one year, rather than three years, is the appropriate sanction. Therefore, Haught's license to practice law in this State is suspended for one year. Furthermore, this Court adopts and orders the additional sanctions set forth in the Hearing Panel Subcommittee's Report and Recommendation. *See* n. 1, *supra*.

**License to Practice Law in West Virginia Suspended for One Year And Additional Sanctions**.