IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2025 Term

_____

No. 24-122

_____

**FILED**

**November 5, 2025**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LAWYER DISCIPLINARY BOARD,
Petitioner,

v.

VICKIE L. HYLTON, a member of the West Virginia State Bar,
Respondent.

_____

Lawyer Disciplinary Proceeding
No. 23-03-056

REPRIMAND AND OTHER SANCTIONS
_____

Submitted: October 7, 2025
Filed: November 5, 2025

Rachel L. Fletcher Cipoletti, Esq.
Chief Lawyer Disciplinary Counsel
Office of Lawyer Disciplinary Counsel
Charleston, West Virginia
Counsel for Lawyer Disciplinary Board

Timothy P. Lupardus, Esq.
Pineville, West Virginia
Counsel for Respondent

JUSTICE TRUMP delivered the Opinion of the Court.

JUSTICE EWING, deeming himself disqualified, did not participate in the decision of this case.

JUDGE SABRINA DESKINS, sitting by temporary assignment.

SENIOR STATUS JUSTICE HUTCHISON, deeming himself disqualified, did not participate in the decision of this case.

JUDGE JASON J. FRY, sitting by temporary assignment.

CHIEF JUSTICE WOOTON dissents and reserves the right to file a separate opinion.

**SYLLABUS BY THE COURT**

1. "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. Pt. 3, *Comm. on Legal Ethics of W. Va. State Bar v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984).

2. "A *de novo* standard applies to a review of the adjudicatory record made before the [Hearing Panel Subcommittee] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Hearing Panel Subcommittee's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Hearing Panel Subcommittee's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record." Syl. Pt. 3, *Comm. on Legal Ethics of W. Va. State Bar v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).

3. "Rule 3.16 of the Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: 'In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted

i

intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.'" Syl. Pt. 4, *Off. of Law. Disciplinary Couns. v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

4.    "In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession." Syl. Pt. 3, *Comm. on Legal Ethics of W. Va. State Bar v. Walker*, 178 W. Va. 150, 358 S.E.2d 234 (1987).

TRUMP, Justice:

This is a lawyer disciplinary proceeding arising from a complaint filed against Respondent Vickie L. Hylton ("Ms. Hylton" or "the respondent") by Petitioner Lawyer Disciplinary Board ("the Board"). Prior to the final hearing in this matter, the respondent and the Board entered into "Stipulated Findings of Fact, Admitted Violations of the Rules of Professional Conduct, and Jointly Recommended Sanctions" ("the Stipulations"), which they introduced as a joint exhibit at the final hearing before the Board's Hearing Panel Subcommittee ("the HPS"). The HPS admitted the Stipulations into evidence and thereafter adopted them as its "Report of Hearing Panel Subcommittee" ("the Final Report"). The HPS found that the respondent violated Rules 1.15(b) and (f) of the Rules of Professional Conduct by mismanaging her IOLTA account[1] and Rule 8.1(a) by knowingly making a false statement of material fact to the Office of Disciplinary Counsel ("the ODC") during its investigation of this disciplinary matter and recommended that she be admonished, along with other sanctions. Neither the respondent nor the Board contests the HPS's findings as set out in the Final Report, and both parties request that this Court adopt the HPS's findings and recommended discipline. However, by order dated January 13, 2025, this Court directed that the matter be set for oral argument pursuant to Rule 19 of the Rules of Appellate Procedure and entered a briefing schedule.

---

[1] "'IOLTA'" is an acronym for Interest on Lawyer Trust Accounts. Lawyers are required to maintain such an account under Rule 1.15 of the West Virginia Rules of Professional Conduct." *Law. Disciplinary Bd. v. Morgan,* 228 W.Va. 114, 120 n.11, 717 S.E.2d 898, 904 n.11 (2011).

1

The Court has now carefully reviewed the parties' briefs and arguments, the appendix record, and the applicable law. For the reasons provided below, we find clear and convincing evidence to support the HPS's factual findings but modify its recommended sanction and order that Ms. Hylton be reprimanded and other sanctions as more fully set forth herein.

## I. FACTS AND PROCEDURAL HISTORY

Ms. Hylton was admitted to the West Virginia State Bar on October 6, 2005, and practices in Raleigh County, West Virginia. She testified at the final hearing before the HPS that, over time, she has narrowed the scope of her practice to serve exclusively as a court appointed guardian ad litem for children in abuse and neglect cases and for protected adults in guardian and conservator cases. She has no prior disciplinary history.

In January 2023, the ODC opened a complaint against the respondent after it received a notice from Chase Bank stating that on January 12, 2023, the respondent's IOLTA account lacked sufficient funds to honor a check in the amount of $565.39. The respondent timely replied, advising the ODC that the overdraft was a "simple error. There were no client funds in the IOLTA. All had been paid out and the balance was zero." She explained that the checks for her IOLTA account and another account were kept in the same locked location in her office, and when she retrieved a check from that location on January 10, 2023, to pay her personal property taxes, she inadvertently chose a check from her IOLTA account. She alleged that she realized her error later that evening and notified the

2

payee the next morning that "the check would not be honored due to being from the wrong account, an account that had a zero balance." On January 17, 2023, she deposited $700 into her IOLTA account to cover the check and any ancillary charges imposed by the bank, and the bank honored the instrument that same day. She emphasized that this incident constituted a simple mistake, that no client funds were in any danger, and that "this is the first and only time I've made this error." Finally, the respondent advised the ODC that she planned to close her IOLTA account and destroy any remaining checks because she no longer handles client funds in her practice.[2]

As part of its investigation of this matter, the ODC issued a subpoena duces tecum to Chase Bank requesting copies of all records related to the respondent's and her law office's business, operating, trust, or IOLTA accounts for the period beginning January 12, 2022, through the date of the subpoena. The bank produced the transactional history of the respondent's IOLTA account from January 2022 through February 2023, showing that throughout the thirteen months documented therein the respondent consistently issued checks from her IOLTA account payable both to herself and to "CSED"[3] in satisfaction of

---

[2] At the final hearing, the respondent's counsel proffered that she might have reopened her IOLTA account. However, during oral argument before this Court, her counsel advised that the respondent has now closed the account. We observe that, in certain defined circumstances, attorneys are not required to maintain IOLTA accounts. *See* State Bar Admin. Rule 10.07 (exempting, *inter alia*, attorneys whose practice is such that they "never receive[] client funds that would require an IOLTA Trust Account").

[3] "CSED" is an acronym for Child Support Enforcement Division, though in West Virginia this agency is designated the Bureau for Child Support Enforcement.

her adult son's child support obligation. The records further show that, in addition to the personal property tax payment previously noted, the respondent authorized an electronic transfer from her IOLTA account exceeding $5,000.00 to a South Carolina resort on January 6, 2023. While this transaction resulted in an account balance that was insufficient to cover the $565.39 check described above, the records are clear that at no point in the twelve months preceding the respondent's initial written response to the ODC had the balance in her IOLTA account been zero.

The ODC presented this information to the Board's Investigative Panel, which concluded that the respondent misappropriated and converted funds held in her IOLTA account to her own personal use by authorizing the electronic payment to the South Carolina resort and by writing the check to pay her personal property taxes.[4] The Investigative Panel also determined that the respondent knowingly made false statements of material fact to the ODC in its investigation of this matter, though it did not specify the statements to which it was referring. Based on these findings, the Investigative Panel found that probable cause existed to charge the respondent with violating Rule 8.4(c) and (d) of the Rules of Professional Conduct[5] by misusing her IOLTA account as described herein

---

[4] The Investigative Panel noted that it was difficult to determine from the bank records whether the respondent had earned the fees she paid to herself from her IOLTA account.

[5] Rule 8.4(c) and (d) define "professional misconduct" to include "engaging in conduct involving dishonesty, fraud, deceit or misrepresentation" and "engaging in conduct that is prejudicial to the administration of justice."

and Rule 8.1(a)[6] and Rule 8.4(c) and (d) by making false statements of material fact to the ODC. The Investigative Panel then issued its formal Statement of Charges detailing these findings.

The respondent timely filed a verified response to the Statement of Charges admitting to the factual bases on which the Investigative Panel determined that she mismanaged her IOLTA account, but denying that she had committed the rule violations charged therein. Specifically, the respondent denied that she misappropriated or converted client funds to her own use or that anything in her initial written response to the ODC was intentionally false. She asserted that all funds in the IOLTA account were hers and were fully earned when deposited, except for the funds deposited by her son so she could disburse his child support payments from that account.

On June 17, 2024, the HPS held a final evidentiary hearing on this matter. The respondent's testimony at the hearing, which mirrored her initial written response to the ODC, was that she kept all her checks in one place and inadvertently grabbed the wrong checkbook when she paid her personal property taxes. Upon realizing her error, she contacted the sheriff's office, which was the payee of the check, to ask if they present the check for payment more than once or if she should bring them cash to cover it. She testified that the sheriff's office informed her that it automatically re-presents returned checks for

---

[6] Rule 8.1(a) prohibits "a lawyer . . . in connection with a disciplinary matter [from] knowingly mak[ing] a false statement of material fact[.]"

5

payment and advised her to deposit sufficient funds into her account to satisfy the outstanding check, which she did, and the bank subsequently honored the payment. A review of the appendix record shows that the respondent wrote a check from her IOLTA account to the sheriff's office on January 10, 2023, and that the sheriff's office presented this check for payment on January 11, 2023. On January 17, 2023, Chase Bank sent a notification to the respondent and the ODC that the account had insufficient funds for payment of the check on January 12. Also on January 17, 2023, the respondent deposited $700 into her IOLTA account. On January 18, 2023, the bank honored the draft.

The respondent then explained that the checks from her IOLTA account payable to "CSED" were payments made on behalf of her adult son to satisfy his child support obligation in West Virginia. The respondent testified that, because her son lives in another state, there can be delays in processing his child support payments that may put him in arrears. Rather than having his child support be collected through another state, he provided money to the respondent, who used her IOLTA account to send checks to "CSED" to pay his child support obligation, thereby keeping the collection process in West Virginia. She testified that she did this as his mother and not as part of an attorney-client relationship. The bank records show that the respondent wrote IOLTA checks to "CSED" from January through November 2022. They also show that she deposited one check from her son's

6

business in July 2022, in an amount that seemed to fund several months of child support payments.[7]

With regard to the charge of misappropriating and converting IOLTA funds to her own use, the respondent testified that her current legal practice is confined exclusively to court-appointed guardian ad litem matters. As such, she no longer accepts private clients on a retainer basis, nor does she handle cases that would generate recoveries for clients requiring the maintenance of such funds in trust. Instead, her practice consists solely of court appointments, so she has already earned the fees by the time she submits invoices for her legal services to the appropriate authority for payment. She then deposited at least some of this earned compensation into her IOLTA account. Thus, the respondent maintains there were no client funds in her IOLTA account during the period in question, and none of the transactions reflected by the bank records involved the misappropriation or conversion of client funds. Instead, she had been using her IOLTA account "as sort of a personal savings account in a way."[8]

---

[7] The bank records do not provide images that substantiate every deposit the respondent made into her IOLTA account during the thirteen months under review.

[8] The bank records show that the respondent deposited a check from the State of West Virginia and a check from Progressive that referenced a name and claim number. The parties did not discuss the provenance of these checks at the final hearing but clarified during argument before this Court that both checks were payment of the respondent's earned fees for services as a court-appointed guardian ad litem.

In addressing the allegation that she made false statements of material fact during this disciplinary matter, the respondent admitted that her initial written response to the ODC contained "at least one statement" that was "not entirely and fully materially, factually true." She stated that she "was asked about a check and I answered about a check[,]" and agreed with her counsel's explanation that she did not think to address the fact that she had been using her IOLTA account as her personal savings account. She also admitted that she should have responded that the IOLTA account had no client funds in it, not that it had a zero balance, and that the "zero balance" statements were misleading with regard to the personal use to which she had repurposed her IOLTA account. While she initially claimed that her false statements were not meant to mislead but were instead "rushed and a bit negligent," the respondent later admitted that she knew she was making a false statement when she said the account balance was zero.

Prior to the hearing, the ODC and the respondent entered into the Stipulations, which the HPS admitted into evidence as a joint exhibit at the final hearing. The Stipulations adopted the facts as presented in the Statement of Charges and reflected the respondent's agreement that she deposited and commingled personal funds[9] in her IOLTA account in violation of Rule 1.15(b),[10] constituting an improper use of an IOLTA

---

[9] The evidence in the record does not substantiate that she commingled client funds with her own money.

[10] Rule 1.15(b) allows a lawyer to "deposit the lawyer's own funds in a client trust account for the sole purpose of paying bank service charges on that account, but only in an amount necessary for that purpose."

account in violation of Rule 1.15(f),[11] and that she knowingly made false statements of material fact to the ODC during its investigation in violation of Rule 8.1(a). The Stipulations also contained a "Stipulation as to Rule 3.16 Analysis,"[12] in which the parties agreed that the respondent's conduct violated a duty to the legal system and to the profession; that her mental state in violating these rules was knowing; that there was no known injury, but that the potential for injury due to improper use of bank accounts associated with the practice of law is great; and that the mitigating factors in this case (i.e., the absence of a prior disciplinary record, remorse, and acceptance of responsibility) outweigh the aggravating factor (experience in the practice of law). Finally, the Stipulations recommended the following sanctions: (1) admonishment; (2) that the respondent cease improper use of the IOLTA account and provide verification that all accounts associated with her law practice[13] are in compliance with the Rules of Professional Conduct, the State Bar Bylaws, and any other relevant laws; (3) six additional continuing legal education hours in law office management; and (4) that the respondent pay the costs of this

---

[11] Per Rule 1.15(f), "[a] lawyer who receives client funds that are nominal in amount or are expected to be held for a brief period shall establish and maintain a pooled, interest or dividend-bearing account for the deposit of such funds at an eligible financial institution in compliance with State Bar Administrative Rule 10."

[12] Rule 3.16 of the Rules of Lawyer Disciplinary Procedure establishes the factors for this Court or the Board to consider in imposing sanctions. They are: "(1) whether a lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors."

[13] This case deals only with the respondent's IOLTA account, not her operating account or any other bank account associated with her law practice.

9

disciplinary proceeding. On October 1, 2024, the HPS issued its Final Report, which adopted the Stipulations in their entirety.

## II. STANDARD OF REVIEW

"This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. Pt. 3, *Comm. on Legal Ethics of W. Va. State Bar v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984). Thus,

> [a] de novo standard applies to a review of the adjudicatory record made before the [Hearing Panel Subcommittee of the Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [HPS's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

Syl. Pt. 1, *Law. Disciplinary Bd. v. Cain*, 245 W. Va. 693, 865 S.E.2d 95 (2021) (quoting Syl. Pt. 3, *Comm. on Legal Ethics of W. Va. State Bar v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994)).

## III. DISCUSSION

Upon review, we conclude there is no reason to disturb the factual findings and rule violations detailed in the Final Report and outlined above.[14] Thus, the sole issue

---

[14] We note, however, the Court's recent holding in syl. pt. 3, *In re Boso*, ___W. Va. ___, ___ S.E.2d ___ (2025) ("In judicial disciplinary matters, the Court is not bound by

in this case is the appropriate disciplinary action for Ms. Hylton's violations of the Rules of Professional Conduct.

This Court has stated that:

> Rule 3.16 of the Rules of Lawyer Disciplinary Procedure enumerates the factors to be considered in imposing sanctions and provides as follows: "In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] of Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors."

Syl. Pt. 4, *Off. of Law. Disciplinary Couns. v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

It is also important to observe that this Court explicitly considers the deterrent effect when choosing between sanctions; the chosen sanction must serve to discourage similar violations by other members of the Bar and to restore public confidence in the ethical standards of the legal profession. *See* Syl. Pt. 3, *Comm. on Legal Ethics v. Walker*, 178 W. Va. 150, 358 S.E.2d 234 (1987) ("In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps

---

admissions or stipulations to facts or violations of the West Virginia Code of Judicial Conduct and may employ its independent, de novo review to determine whether such stipulations are both legally and factually supported."). *See supra* notes 9 and 13.

would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the bar and at the same time restore public confidence in the ethical standards of the legal profession."); *Law. Disciplinary Bd. v. Hatfield*, 244 W. Va. 285, 294, 852 S.E.2d 785, 794 (2020) ("This Court's goal in imposing lawyer discipline is not simply the punishment of the offending lawyer; a sanction must also be designed to deter the conduct of other lawyers and to restore the public's confidence in our legal system."). This public function distinguishes sanctions in lawyer disciplinary actions from purely punitive or rehabilitative measures and emphasizes their role in maintaining professional standards. *See Comm. on Legal Ethics v. Keenan*, 192 W. Va. 90, 94, 450 S.E.2d 787, 791 (1994) ("Attorney disciplinary proceedings are primarily designed to protect the public, to reassure it as to the reliability and integrity of attorneys and to safeguard its interest in the administration of justice."); *Hatfield*, 244 W. Va. at 293, 852 S.E.2d at 793 ("[I]n an effort to ensure the highest quality of legal services in this State, we also have stated that 'attorney disciplinary proceedings are not designed solely to punish the attorney, but rather to protect the public, to reassure it as to the reliability and integrity of attorneys and to safeguard its interest in the administration of justice.'") (quoting *Law. Disciplinary Bd. v. Taylor*, 192 W. Va. 139, 144, 451 S.E.2d 440, 445 (1994)). With these tenets in mind, we turn to the ethical violations in this case.

12

**A. Violation of Rule 1.15(b) and (f): Misuse of IOLTA Account**

As noted above, there is no evidence that the respondent misappropriated client money or converted client money to her own use, and we do not disturb the HPS's finding in this regard. However, we agree with the ODC that the respondent "mismanaged the IOLTA account incredibly[.]" The proper management of client trust accounts is not a matter to be taken lightly, and while we acknowledge that the respondent did not commit the ultimate breach of mishandling client funds, the Court must emphasize that attorneys are obligated to administer client trust accounts with the utmost care and in the strictest adherence to the rules governing their operation. To this point, the Court has recently stated that "misuse of an IOLTA account is a breach of trust that reflects poorly on the entire legal profession." *Law. Disciplinary Bd. v. Greer*, 252 W. Va. 1, 7 , 917 S.E.2d 1, 7 (2024).

Attorneys are required to hold client funds *separate* from the attorney's own funds. *See* Rule 1.15(a) and State Bar Admin. Rule 10.01 (emphasis added). Attorneys may deposit their own funds into their client trust accounts *only* for the purpose of paying, and only in an amount necessary to pay, bank service charges on such accounts. *See* Rule 1.15(b) (emphasis added). Rule 1.15(f) requires attorneys to establish and maintain an IOLTA account in which to deposit client funds that are "nominal in amount or expected to be held for a brief period[.]" Attorneys must also ensure that client trust funds are deposited appropriately, kept in eligible financial institutions, and reported annually to the State Bar. *See* State Bar Admin. Rule 10.02 – 10.04. The duties imposed by these rules require, *inter alia*, that there be no commingling of client funds with the attorney's personal or firm funds

and that the attorney maintain accurate, contemporaneous records of all transactions involving client trust accounts. *See Law. Disciplinary Bd. v. Chittum*, 225 W. Va. 83, 90, 689 S.E.2d 811, 818 (2010) (holding that failing to properly maintain and administer a separate client trust account and commingling personal money with client funds violated Rule 1.15(a) and (d) even when no client funds were misappropriated); *Law. Disciplinary Bd. v. Haught*, 233 W. Va. 185, 195, 757 S.E.2d 609, 619 (2014) (holding that attorney's failure to properly maintain his client trust account violated Rule 1.15(a) even though the attorney did not convert client funds to his own use). Any deviation by an attorney from these duties, whether through negligence or deliberate action, constitutes a serious transgression of our Rules of Professional Conduct. The proper maintenance of client trust accounts is not a peripheral administrative task but a core obligation of the legal profession. *See, e.g.*, *Greer*, 252 W. Va. at 11, 917 S.E.2d at 11 (noting that the "formation and proper operation of an IOLTA account represents a key protection of funds rightfully belonging to clients against comingling and misappropriation[,]" which is a "fundamental and basic ethical duty of all attorneys licensed to practice in West Virginia."); *Morgan*, 243 W. Va. at 644, 849 S.E.2d at 644 (describing "the safekeeping of client funds" in a properly managed IOLTA account as a lawyer's "most important responsibility").

In this case, the respondent both stipulated in writing and admitted at the final hearing that she misused her IOLTA account in violation of Rule 1.15(b) and (f). We agree. There is no question that the respondent's use of her IOLTA account as "a personal savings account" fell markedly short of the requirements imposed by, and was a clear and

14

substantial violation of, the Rules of Professional Conduct. The bank records show that, for at least thirteen months, the respondent routinely deposited funds into her IOLTA account that were not client funds, funds belonging to a third person she was holding in connection with a representation, or funds to pay bank service fees. Instead, the funds were her personal property that she should have deposited into her operating account or a personal account. Similarly, the debit history of her IOLTA account demonstrates a pattern of disbursements for non-business or client related expenses, including payments to herself, payments of her son's child support obligation, and other personal expenses. While not diminishing the fact that there is no evidence that the respondent mishandled client funds, we cannot excuse her egregious mismanagement of her IOLTA account. As we have stated, "there does not exist in the Rules of Professional Conduct a 'no harm, no foul' rule.'" *Haught*, 233 W. Va. at 195, 757 S.E.2d at 619 (quoting *Law. Disciplinary Bd. v. Blevins*, 222 W. Va. 653, 659, 671 S.E.2d 658, 664 (2008) (citation modified).

**B. Violation of Rule 8.1(a): Knowingly False Statements in Disciplinary Proceeding**

In addition to using her IOLTA account improperly, the respondent also stipulated in writing and admitted at the final hearing that she made false statements of material fact to the ODC during its investigation of this matter in violation of Rule 8.1(a). The record is clear that the respondent, at the very least, attempted to mislead the ODC in her initial written response to the complaint. Such attempts by attorneys to deceive the ODC evince a lack of respect for the legal system and the disciplinary process that the Court will address with the seriousness it deserves. The subtitle of the group of rules of

15

which Rule 8.1(a) is a part is "Maintaining the Integrity of the Profession," and false statements in disciplinary proceedings strike at the heart of this integrity – regardless of client harm – by undermining the profession's self-regulatory framework, ability to police itself effectively, and public confidence in the legal profession. *See Law Disciplinary Bd. v. Duty*, 222 W. Va. 758, 766, 671 S.E.2d 763, 771 (2008) (finding that "[public] confidence [in the legal profession] was further damaged by Duty's failure to cooperate with, and give truthful statements to, the Office of Disciplinary Counsel."); *In re Pena*, 23 N.W.3d 548, 553 (Minn. 2025) ("Failing to cooperate with a disciplinary investigation harm[s] the legal profession by undermining the integrity of the attorney disciplinary system . . . and weakens the public's perception of the legal profession's ability to self-regulate.") (internal citations omitted); *In re Clark*, 663 P.2d 1339, 1342 (Wash. 1983) ("Obviously, unless attorneys cooperate in the [disciplinary] process, the system fails and public confidence in the legal profession is undermined. If the members of our profession do not take the process of internal discipline seriously, we cannot expect the public to do so and the very basis of our professionalism erodes.").

While the respondent conceded at the final hearing that she had been misusing her IOLTA account, that was not the case during the ODC's preliminary investigation of this matter. In her initial written response, she stated that "[t]here were no client funds in the IOLTA. All had been paid out and the balance was zero." At the final hearing, the respondent attempted to cast the "zero balance" statement as "negligent and rushed," offering that it was "missing a few words. . . . [I]t should've said the balance is

zero as it pertains to client funds." However, she used the same language again later in the response when she claimed that she called the sheriff's office to advise them that "the check would not be honored due to being from the wrong account, an account that had a zero balance."[15] Rather than mere careless word choice, the respondent's repeated use of the words "zero balance" evinces an effort to persuade the ODC to conclude that her use of the IOLTA check for personal expenses was an isolated incident – a "simple error" – not evidence of her habitual misuse of her IOLTA account as a "personal savings account." As she eventually admitted at the final hearing, this was not a drafting error; it was misleading, and she knew at the time she made the statement that it was false.

The respondent's acknowledgment that her trust account practices failed to adhere to the prescribed rules governing such accounts came only after the ODC had obtained her bank records and conclusively documented that her initial written response was misleading. Although the Court acknowledges the respondent's admissions at the final hearing regarding both the improper administration of her IOLTA account and the false statements in her initial written response to the ODC, [16] we take a dim view of any attempt to mislead disciplinary authorities.

---

[15] We find it notable that the respondent did not describe the error as using her IOLTA account, but as using "an account with a zero balance."

[16] As noted above, the respondent also admitted at the final hearing that "at least one" statement in her initial written response was "not entirely and fully materially, factually true."

17

This Court has remarked that

> [n]o single transgression reflects more negatively on the legal profession than a lie. The honor of practicing law does not come without the concomitant responsibilities of truth, candor and honesty. . . . It can be said that the presence of these virtues in members of the bar comprises a large portion of the fulcrum upon which the scales of justice rest. Respect for our profession is diminished with every deceitful act of a lawyer.

*Law. Disciplinary Bd. v. Munoz*, 240 W. Va. 42, 51, 807 S.E.2d 290, 299 (2017) (internal citations omitted) (suspending Mr. Munoz for 90 days with automatic reinstatement for several ethical breaches, three of which involved dishonesty, one of those being making false statements during the disciplinary process); *Law. Disciplinary Bd. v. Atkins*, 243 W. Va. 246, 256, 842 S.E.2d 799, 809 (2020) (finding the attorney's "fail[ure] to be truthful in the investigation of this matter" as a reason the Court issued a more serious sanction than that recommended by the HPS). *See also Law. Disciplinary Bd. v. Losch*, 219 W. Va. 316, 319, 633 S.E.2d 261, 264 (2006) (per curiam) (stating that "'[h]onesty is one of the cornerstones of the legal profession.'") (quoting *Off. of Law. Disciplinary Couns. v. Galford*, 202 W. Va. 587, 590, 505 S.E.2d 650, 653 (1998)).

## C. Determining the Appropriate Sanction

This Court's analysis of the proper sanction in lawyer discipline cases is guided by the Rule 3.16/*Jordan* factors stated above. While the parties have stipulated the manner in which these factors apply to the ethical violations in this case, we nonetheless

18

find it appropriate to review each factor independently to fix the appropriate measure of discipline.

First, in using her IOLTA account for impermissible purposes and providing "at least one" materially false statement to the ODC, the respondent violated not only the Rules of Professional Conduct but also her duties to the legal system and the profession.

> As officers of the court, lawyers owe duties to the legal system whereby they must conduct themselves within the bounds of the law and abide by the rules of substance and procedure which afford the administration of justice. As to the legal profession, lawyers owe an ethical duty to maintain the integrity of the profession.

*Law. Disciplinary Bd. v. Blyler*, 237 W. Va. 325, 341, 787 S.E.2d 596, 612 (2016). We have already discussed above how this duty is breached by engaging in dishonesty with disciplinary authorities. With regard to mishandling IOLTA accounts, the Court has noted that "misuse of an IOLTA account is a breach of trust that reflects poorly on the entire legal profession." *Law. Disciplinary Bd. v. Hart*, 241 W. Va. 69, 87, 818 S.E.2d 895, 913 (2018). *See also In re Mulligan*, 870 N.W.2d, 233, 242 (Wis. 2015) ("In most jurisdictions, disciplinary authorities treat violations of the rule against commingling trust funds and personal funds extremely seriously. . . . Even where the client or third party suffers no loss, harsh sanctions usually follow as a prophylactic warning that comingling cannot be tolerated.") (quoting GEOFFREY C. HAZARD, JR., THE LAW OF LAWYERING, 19-9 (3d ed. Supp. 2014)). In the instant case, the nature of the respondent's stipulated rule violations constitutes a manifest breach of these duties.

Next, the respondent stipulated that she acted knowingly in violating the rules at issue here. Intent is the most culpable mental state, knowledge is the next most culpable, and negligence is the least culpable. *See Blyler*, 237 W. Va. at 341, 787 S.E.2d at 612. This Court has explained that "'[k]nowledge' is evident when the lawyer acts with 'conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result.'" *Hart*, 241 W. Va. at 87, 818 S.E.2d at 913 (internal citation omitted). Further, "[a]ll three levels of culpability [intentional, knowing, and negligent] warrant discipline; however, the degree of the misconduct is an issue in determining the severity of discipline to be imposed." *Morgan*, 228 W. Va. at 122, 717 S.E.2d at 906 (2011). In this case, the respondent testified at the final hearing that she at least should have known that she was not permitted to deposit her personal funds into her IOLTA account. Her years of experience in the practice of law corroborate this admission. She also testified that she knew when she submitted her initial written response to the ODC that the "zero balance" statements were false. Thus, we accept the parties' stipulation that the respondent's degree of culpability was knowing.[17]

---

[17] The parties posited that the respondent's knowing misuse of her IOLTA account was "seemingly less egregious" than the negligent misuse of such accounts involving client funds that resulted in reprimand. They cite in support of their argument *Chittum*, 225 W. Va. 83, 689 S.E.2d 811 (2010); *Law. Disciplinary Bd. v. Niggemyer*, No. 31655 (W. Va. May 11, 2005) (unpublished); and *Law. Disciplinary Bd. v. Cline*, No. 32984 (W. Va. March 19, 2007) (unpublished). However, this argument fails to take into account that, unlike the respondent, none of these attorneys were found to have also violated Rule 8.1(a).

Third, with respect to the level of injury, while there was no actual injury to a client in this case, the parties stipulated that the risk of harm posed by attorneys' improper use of their professional bank accounts is great. While the Final Report does not specify to whom the potential for injury is great, as discussed above, mismanagement of client trust accounts and dishonesty with the ODC result in potential harm not only to clients but to the public, the legal system, and the profession. Specifically, trust account management serves broader systemic functions beyond individual client protection. *See In re Cary*, 585 P.2d 1161, 1162 (Wash. 1978) ("The nourishment of public trust and confidence in the legal profession, as well as our legal system, demands the utmost fidelity of the attorney with respect to his trust account."); *In re Hansen*, 868 N.W.2d 55, 60 (Minn. 2015) ("The proper maintenance of trust accounts is important to the legal profession because it serves to protect the client and avoid even the appearance of professional impropriety.") (internal citations omitted). Further, the requirements to maintain separate accounts and proper records and comply with administrative rules creates a framework for professional oversight and public confidence that can be violated through procedural failures alone. *See In re Skagen*, 149 P.3d 1171, 1187 (Or. 2006) (noncompliance with rules of trust account maintenance constitute ethical violations independent of client harm); *In re Mulligan*, 870 N.W.2d 233, 242 (2015) (Wisc. 2015) ("The problem is that inadequate trust account records are themselves a form of wrongdoing. . . . Comingling funds is not a trivial or technical rule violation."); *Iowa Supreme Court Att'y Disc. Bd. v. Smith*, 904 N.W.2d 154, 159-161 (Iowa 2017) (finding that, while attorney "maintained a proper trust account, kept bank records for that account, maintained individual client trust account ledgers, and

performed some monthly reconciliations," he did not "perform client-by-client reconciliations," a negligent procedural violation that warranted public reprimand even though "[n]o client suffered financial harm."). *See also generally* WEST VIRGINIA STATE BAR, WEST VIRGINIA CLIENT TRUST ACCOUNT HANDBOOK (2017).

The purpose of an IOLTA account is to safeguard the property of clients or third parties, so an attorney's operation of such account creates and is governed by a strict fiduciary duty. *See* Rule 1.15 cmt. [1] ("A lawyer should hold property of others with the care required of a professional fiduciary."). This is one reason trust account violations are a key area in which the Court imposes significant discipline based on potential harm even if little or no actual harm resulted from the violation(s). *See Greer*, 252 W. Va. at 12, 917 S.E.2d at 12 (while finding actual injury only to one client, the Court emphasized that "the *potential* injury to scores of innocent clients cannot be understated.") (emphasis in original); *Haught*, 233 W. Va. at 195, 757 S.E.2d at 619 (stating that the fact that clients weren't injured "is not an excuse for Respondent's failure to properly maintain his client trust account."); *Chittum*, 225 W. Va. at 92, 689 S.E.2d at 820 (reprimanding attorney even though "there was no actual injury to any client . . . with regard to Mr. Chittum's commingled funds and failure to maintain a proper IOLTA account."). Thus, this Court regards as a serious breach even seemingly victimless mishandling of IOLTA accounts, given the profound risk of harm inherent in any departure from strict fiduciary standards.

22

Finally, the Court must consider and balance any mitigating and aggravating factors as part of determining an appropriate sanction. *See Law. Disciplinary Bd. v. Scott*, 213 W. Va. 209, 217, 579 S.E.2d 550, 558 (2003). We have defined aggravating factors as "any considerations or factors that may justify an increase in the degree of the discipline to be imposed." *Id.* at syl. pt. 4, in part. On the other hand, mitigating factors "are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." *Id.* at syl. pt. 2, in part. We have recognized that "[t]here is no 'magic formula' for this Court to determine how to weigh the host of mitigating and aggravating circumstances to arrive at an appropriate sanction; each case presents different circumstances that must be weighed against the nature and gravity of the lawyer's misconduct." *Law. Disciplinary Bd. v. Sirk*, 240 W. Va. 274, 282, 810 S.E.2d 276, 284 (2018). Here, the parties stipulated that mitigating factors (no prior disciplinary record and remorse/acceptance of responsibility) outnumber aggravating factors (experienced practitioner). While the respondent's lack of prior disciplinary record and eventual acceptance of responsibility are notable, as is the important nature of the work on which she has focused her practice (primarily guardian ad litem appointments in abuse and neglect cases and for other protected persons), her experience in the profession and the seriousness of the violations compel imposition of a meaningful sanction, as seasoned attorneys are held to the highest standards of professional conduct.

Considering the nature of the violations committed in this case, application of the Rule 3.16/*Jordan* factors thereto, and the multifaceted purpose of lawyer disciplinary

23

proceedings discussed above, we conclude that a reprimand is warranted to emphasize the importance of strict adherence to the rules both governing lawyer trust accounts and requiring honesty and full candor in lawyer disciplinary matters.

## IV. CONCLUSION

For the foregoing reasons, we impose the following sanctions:

(1)     The respondent is hereby reprimanded.

(2)     If the respondent reopens an IOLTA account,[18] she shall notify the ODC immediately and, for one year thereafter, permit an attorney in good standing, mutually agreed upon by the respondent and the ODC, to conduct monthly reviews of the account records and report to the ODC regarding her compliance with all applicable laws and rules governing such accounts.

(3)     The respondent shall complete six additional hours of continuing education during the current reporting period in the areas of ethics and law office management.

(4)     The respondent shall pay the costs of this disciplinary proceeding pursuant to Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.

Reprimand and other sanctions imposed.

---

[18] Because the respondent no longer has an IOLTA account, *see* note 2 supra, the Court modifies this sanction to reflect more accurately the nature of her current practice and to correspond more closely with the serious nature of the stipulated violations.